## THE ALASKA, etc.

*(District Court, S. D. New York. November 28, 1884.)*

1. COLLISION—VIGILANCE—STEAMER TO STOP AND BACK — FLASH-LIGHT — NEGLECT—DAMAGES DIVIDED.

Navigation at a very high rate of speed imposes upon a steamer the duty of proportionately increased vigilance, and the avoidance of every alternative in navigation which involves or increases the risk of collision. Where there is risk of collision with a sailing vessel, the burden of proof is upon the steamer to justify her departure from rule 21 in not stopping and backing, or else she must be held in fault. The steam-ship A., 500 feet long, steaming W. by S. at the rate of 20 miles an hour, when off Nantucket came in collision about 60 feet from her stern with the bow of the brig C., sailing close-hauled about S. The A.'s lights were seen from the brig at a considerable distance. On the steamer, though three officers were on the bridge and two men on the lookout, the brig's red light was not seen until about a minute before the collision. The brig's witnesses testified that a torch-light was exhibited at her waist from 5 to 10 minutes before the collision; the steamer's witnesses testified that no

torch-light was seen until the steamer's bows had passed the brig's stern; *held*, without determining the fact as to the time the flash-light was exhibited, that the brig's red light being more than one point in range for more than two miles previous to the collision, the fact that it was not seen by so many persons on the steamer who were on the watch for such lights was sufficient proof that the red light was defective; and the steamer having starboarded when the brig's red light was seen at least three-quarters of a minute before the collision, and kept on at full speed, instead of stopping and backing, as rule 21 requires, it appearing that by backing the collision might have been avoided, that the steamer was also in fault, and the damages should be divided.

Collision.

*Owen & Gray,* for libelants.

*Beebe & Wilcox,* for claimants.

Brown, J. At a little before 10 p. m. on Saturday, the twenty-eighth of May, 1882, the steam-ship Alaska, bound for New York, when off Nantucket, about 20 miles south of the South Shoal light-ship, in passing ahead of the brig Castalia carried away the latter's jib-boom, bowsprit, and head-gear. This action was brought to recover for these damages. The night was clear, dark, and good for seeing lights. The wind was light,—about W. S. W.,—and the sea somewhat rough. The Alaska was 525 feet long by 50 feet beam, and 5,500 tons register. She had been previously sailing upon a course W. by S., (true,) and was making from 17½ to 18 knots, or upwards of 20 statute miles, per hour. The Castalia was a full-rigged bark, 140 feet long, loaded with ice, sailing close-hauled by the wind on her starboard tack, and at the rate of about three or four knots, upon a course, according to her testimony, of S. ½ W. by compass.

The testimony on the part of the brig is to the effect that the steamer's white mast-head light was seen some 15 or 20 minutes before the collision; afterwards her red light, a little forward of abeam on the port side; that at this time no danger of collision was apprehended; but that as she approached nearer and hauled a little further forward she seemed to be bearing for the brig, and that a flash-light was then procured and exhibited at the brig's waist some six or eight minutes before the collision, and kept constantly burning. On the part of the steamer, the testimony of the three officers who were on the bridge, and of one of the men on the lookout, is to the effect that no light from the brig was seen until very shortly before the collision, when her red light was seen from one to two points off the steamer's starboard bow; that the steamer's helm was immediately put hard a-starboard in order to go ahead of the brig; that under this starboard helm the steamer swung only 1½ points to port, so as to be heading S. W. by W. ½ W. at the moment of collision, when her starboard quarter, about 60 feet from her stern, came in contact with the jib-boom of the brig, as above stated. The captain, who was on the bridge in command, was towards the port side when he first saw the brig's red light, and, as he testifies, he instantly gave the order to starboard, and at the same time received the report of the red light from the lookout. He testifies that he at once went to the starboard

side of the bridge and·stayed there until the collision, which, as he estimates, was from one to one and a half minutes afterwards, and that no flash-light was seen until the steamer's bows had already passed the bow of the brig, when the latter was in the line of the bridge.

It was the duty of the steamer to keep out of the way of the brig, and the steamer is responsible for not having done so, provided the brig exhibited the proper lights. The duty of the brig to exhibit a torch-light (section 4234) is not denied; and the principal controversy in the case has been whether the torch-light was exhibited in time. The discrepancy in the testimony on this point is so great that there is evidently much distortion of the truth on one side or the other, or on both sides. There are some circumstances which tend to support the narrative of each; and these circumstances, with the testimony so evenly balanced, have rendered it impossible for me to reach any confident judgment on this main question. I find it unnecessary, however, to decide it, since there are other features of the case, resting upon testimony about which there can be little or no doubt, sufficient to show that both vessels were at fault.

1. The courses and speed of the two vessels are very definitely fixed. There was no liability to any material error on the part of either vessel as to her own course, and little temptation to misstate it. The steamer was going W. by S., true; the brig, sailing close-hauled by the wind, and varying not over half a point, was making from S. to S. $\frac{1}{2}$ W. by compass; the variation there is 11 deg. W., so that the brig's true course varied from S. by E. to S. $\frac{1}{2}$ E. The steamer was making from $17\frac{1}{2}$ to 18 knots per hour; the brig, according to the mate's testimony, about three knots; the master testifies that she was making not over three or four. I assume the rate of three and one-half knots for the brig, but whether three or four knots is immaterial. A drawing of the courses of each vessel carried backward from the point of collision, will show that during a period of from five to ten minutes preceding the collision the steamer must have borne very nearly due E. from the brig; and, assuming the latter's course to have been as her witnesses testify, and, no doubt, correctly, the brig must have been heading, at the least, half a point E. of S., true, so as to have the steamer's lights from the first, as her witnesses consistently state, a little forward of abeam. The rate of progress of each vessel upon her own course was such·as to preserve very nearly the same relative bearings; the steamer hauling very slowly ahead, and having the brig all the time a little on her starboard bow.

Upon these bearings, from the time when the steamer came within two miles of the brig, it is evident that the brig's red light, properly arranged and burning, should have been visible to the steamer. The range of the light, if set according to the regulations, extended nearly two points to the southward of the steamer's course, and should have been clearly seen at least six minutes before the collision. The most

liberal estimate of time during which it was seen on board the steamer —namely, that derived from the captain's testimony—gives, at most, about a minute and a half; yet the brig's testimony is that the red light was burning brightly. Considering the testimony on the part of the brig, that a torch-light was also exhibited during all this period, it might seem remarkable that neither the torch-light nor the red light, though in range, should be seen; and it might seem more probable that there was negligence in the lookout on the steamer than that there was error in the brig's testimony in reference to both lights. This consideration would have been conclusive with me if the red light and the torch-light had been seen from the steamer at the same time. But the testimony on the part of the steamer is that they were not seen at the same time; that the red light was seen first—about a minute before the torch-light; so that the force of the above consideration is wholly lost, unless the testimony on the part of the steamer that the red light and the torch-light were seen at different times be wholly discredited. It is certain, however, that either the red light or the torch-light was seen from a minute to a minute and a half before the collision, because the steamer's course was changed in consequence, and she swung a point and a half to the southward before the collision. There is nothing in the circumstances, beyond the mere fact that the red light was not seen until this short period before the collision, to indicate any negligence in the officers or lookout on board the steamer. The necessity for a careful and constant watch was evidently fully realized with such high speed; the safety of the steamer and of all on board was dependent upon a careful watch. Three officers were on the bridge, and two seamen ahead on the lookout; the night was good for seeing lights; and it seems to me entirely incredible, had the red light been in view for the considerable period of at least four and a half minutes before it was seen by the captain and simultaneously reported to him by the lookout, that it would not have been observed; and equally incredible that, if it had been observed, this steamer, going at the rate of 20 statute miles an hour, would have needlessly delayed a change of course until she had approached so near to a vessel almost directly ahead. All who were on the deck of the steamer testify that the red light was not seen any sooner, and that, as soon as the red light was seen, the wheel was put hard a-starboard. The slight change of course—namely, one and one-half points—which the steamer had time to make before the collision confirms the testimony that the order to starboard could not have been given more than a minute or a minute and a half before the collision. It was probably less than that. I feel bound to hold, therefore, notwithstanding the general testimony as to the proper condition of the brig's red light, that there was something about it that was defective or improper, either in its position or its screening, so as to make its range too small, or else a dimness that prevented its being visible at the distance required by the rules; and that for this

defect the brig must be held chargeable as contributing to the collision.

2. The high speed of 20 statute miles per hour that the Alaska was making greatly increased the ordinary dangers of navigation, and in fact tended to render all navigation by other vessels near to her path hazardous. Considering the increased power of the electric lights that are used in conjunction with this great speed, and the greater distance at which vessels like the Alaska with such lights can be distinguished, I do not feel warranted in holding, as urged by counsel, that such speed is unjustifiable, or is in itself carelessness in ordinary weather on the high seas. Such great speed, however, clearly imposes the duty of a proportionately increased vigilance in watching for other vessels whose lights are visible at the ordinary distance of two miles only, and of the observance of the greatest possible caution after any such lights are discovered ahead, as well as the avoidance also of every alternative in navigation which involves any increase of risk. Such high speed leaves but little time after the light of a sailing vessel may be discovered, though at the distance of two miles, in which to form a judgment as to the latter's course; and there is, consequently, an increased risk of mistake in endeavoring to avoid her. If the situation, therefore, involves any doubt as to the other vessel's course, or of the steamer's ability to clear her, it is the duty of the steamer to slacken her speed, in order to obtain further time for observation, and for a correct judgment as to the safest maneuvers.

In the present case the brig's red light was not seen until long after the time when it should have been seen, and, as I have found above, through the fault of the brig. I am satisfied, however, that the red light was seen a sufficient time before the collision to have enabled the steamer to avoid the brig, had she observed the rules incumbent upon her. The captain estimated the time between his starboard wheel and the collision to be from a minute to a minute and a half. If the time were only one-half of the larger estimate, say three-quarters of a minute, the Alaska, in changing a point and a half before the collision, must have gone nearly 200 feet to the southward of the line of her previous course; if the interval between the starboard wheel and the collision was a minute, she must have gone nearly 300 feet to the southward. From the testimony as to the rate of change of other vessels previously taken before me,[1] and allowing even a considerably less rate of change in the Alaska on account of her greater size, I am disposed to think that the captain's estimate of the time between the starboard wheel and the collision during which the Alaska changed only a point and a half is too large, and that three-quarters of a minute is probably more nearly correct. That interval would give a nearer approach to the distance of the brig from the steamer at the

[1] *The Lepanto*, 21 FED. REP. 651, 664.

time the red light was seen as estimated and testified to by the steamer's witnesses; namely, one or two lengths, although this estimate cannot be strictly relied on. At three-quarters of a minute's distance, a favorable estimate for the Alaska according to her own testimony, the bows of the Alaska would have been about 900 feet from the brig. A drawing of her course upon this basis will show that, had she ported her wheel and gone astern of the Castalia, instead of starboarding, she would have cleared the latter, even without slackening her speed. But she was bound by rule 21 to slacken her speed. At the time her wheel was starboarded there was evident "risk of collision." Rule 21 requires "every steam-vessel, when approaching another vessel so as to involve risk of collision, to slacken her speed, or, if necessary, stop and reverse." The obligation to slacken speed under such circumstances is imperative, unless the steamer can absolve herself, under rule 24, by showing the existence of special circumstances that render a departure from rule 21 necessary. The burden of showing this necessity is upon the steamer. The drawing and the result in this case both show, not only that a departure from the rule was not necessary, but that the departure brought about the collision, when an observance of the rule to slacken speed, coupled with a port-wheel, so as to go astern of the brig, would have certainly avoided it. The evidence shows that the engines of the Alaska can be reversed without delay. Had she reversed her engines at the time when her wheel was starboarded, and even made no change of her helm at all, the evidence warrants the conclusion that she would have passed astern of the brig, as she would certainly have done had she also ported. In these material particulars this case differs from the case of *The New Orleans*, 9 Ben. 303, and is in principle similar to *The Khedive*, 5 App. Cas. 876, and *The Beryl*, 9 Prob. Div. 137, 140, 144.

The Alaska is a British ship, and, as such, if the provisions of the merchant shipping act of 1873 are applicable to her when sued in this court, the case of *The Khedive* would be conclusive against her for not stopping and backing. Section 17 of that act provides that "if in any case of collision it is proved to the court before which the case is tried, that any of the regulations for preventing collisions contained in or made under the merchant shipping acts, 1854 to 1873, have been infringed, the ship by which such regulation has been infringed shall be deemed to be in fault, unless it is shown to the satisfaction of the court that the circumstances of the case made departure from the regulation necessary." In the house of lords, Lord WATSON, in the case of *The Khedive*, says, (p. 902:)

"There is nothing in the case to suggest the existence of any danger of navigation, a due regard to which would have led to a disregard of the sixteenth rule. [Our 21st.] The only existing danger was the very danger to which the rule applies, and to prevent which it was enacted. And there is just as little room for the suggestion that there existed any special circumstances which rendered it necessary for the Khedive to continue at full speed, instead of slowing, or stopping, or reversing, in order to avoid immediate

danger. I am, accordingly, of the opinion that the Khedive, being within the rule of article 16, and not within any of the statutory exceptions to that rule, infringed it; and, seeing it has not been proved to my satisfaction that the circumstances of the case made a departure from the rule necessary, I consider myself bound by the provisions of the act of 1873 (section 17) to hold that the Khedive was in fault."

Under the rules and section 17 of the act of 1873 it was accordingly held in that case that "mere proof that the infringement of the regulation did not in fact contribute to the collision is inadmissible;" "that the legislature intended, at least, to obviate the necessity for the determination of this question of fact (often a very nice one) upon conflicting evidence," (page 894, per Lord BLACKBURN, following the decision in the *Fannie M. Carroll*, 2 Asp. Mar. Cas. 478;) and Lord WATSON adds:

"The legislature did not intend, in certain specified circumstances, to leave mariners to decide for themselves; but, on the contrary, intended to prescribe rules to be observed by all in these circumstances; and that no one was to be excused for non-compliance, or exempted from the statutory consequence of non-compliance, with the rules, in circumstances to which they were applicable, unless he could bring himself within a statutory exception." 5 App. Cas. 900, 901. See, also, *The Rhondda*, 8 App. Cas. 549, 557.

In the still later case of *The Beryl*, 9 Prob. Div. 137, the court of appeals applied the same principle to the Beryl, holding her also in fault for not stopping and reversing at a distance of 300 yards, although the conduct of the other vessel had been "as bad as could be," and "the officer of the Beryl had been put into a difficult position by the obstinate folly and wickedness of the other, because the Beryl did not do that which the act of parliament declares she must do," (page 143;) and in the very recent case of *Maclaren* v. *Compagnie Francaise*, 9 App. Cas. 640, the house of lords again applied the same rule as regards the duty to stop and back. If, however, the only means of avoiding a collision, when the risk of collision is first discoverable, is to keep on at full speed, then rule 24 applies, and departure from rule 18 is not only justifiable but obligatory. *The Benares*, 9 Prob. Div. 16. *Cayzer* v. *Carbon Co.* 9 App. Cas. 873.

The Castalia, as I infer from the record, is an American vessel. Since the two vessels in this case belong to different nationalities, if the law of this country, as the law of the forum, (*The Scotland*, 105 U. S. 30,) rather than the British act of 1873, be the law applicable to the Alaska, then the rule followed in this country would absolve the Alaska in departing from rule 21, only when it appeared satisfactorily that the violation of the rule could not possibly have contributed to the collision. *The Pennsylvania*, 19 Wall. 125. For the reasons above stated, the evidence in this case, instead of showing that the departure from the rule could not possibly have contributed to the collision, shows that the departure from the rule did contribute to it. In the view of the English or of the American law, therefore, the Alaska must be held in fault. The testimony of the first officer

is distinctly to the effect that the Alaska could have been stopped in going one-third of a mile. This seems to me so improbable, though barely possible, that I have not given any weight to this testimony, and have made no reference to it in holding the Alaska responsible; nor have I given any weight to the failure of the Castalia to luff, say half a minute before the collision, as it was clearly her duty to do. At that time the Alaska was seen swinging to the southward under her starboard helm, and her intention to go ahead of the brig was then irrevocably fixed and was evident to the brig. The captain of the brig thought even then that there would be no collision. The Alaska escaped the brig up to about 60 feet of her stern. During this short interval of time the brig could not by luffing have changed her course more than one or two points; this clearly would not have made a sufficient change in her position to avoid the collision, though it might have somewhat eased the blow. On the grounds previously stated, however, each vessel must be held in fault; and the libelant is therefore entitled to a decree for one half his damages, with costs. If the sum is not agreed upon, a reference may be taken to compute the amount.

