### THE EXCELSIOR.

### THE ROBERT GRAHAM DUN.

#### (District Court, E. D. New York. June 2, 1900.)

1. COLLISION—STEAMER AND SAILING VESSEL—FAILURE TO EXHIBIT FLARE-UP LIGHT.

    The navigation rules do not make it obligatory on a vessel to use a flare-up light unless the circumstances are such that prudence would require it; and a schooner cannot be held in fault for a collision with a steamer in the night, because of her failure to exhibit such light, where her other lights were burning brightly, and no necessity appeared therefor until after the time she was discovered by the steamer.

2. SAME—VIOLATION OF RULES BY STEAMER—ATTEMPTING TO CROSS AHEAD OF SCHOONER.

    On a dark but clear night a collision occurred between a steamship and a schooner, which approached each other on nearly parallel courses. The schooner saw the lights of the steamer when 5 or 6 miles distant, and from that time until very shortly before the collision her red light was visible, bearing about a point and a half on the schooner's port bow. The schooner's lights were burning, and, according to a preponderance of the evidence, were in good condition and not obscured, and her red light was seen and announced by the lookout on the steamer; and the first officer, on looking, made out the sails of the schooner nearly ahead, and about 1,800 feet distant. He at once ordered the helm hard a-starboard, and continued at full speed, and the collision followed a minute later. The schooner held her course. *Held*, that she was not in fault for failing to exhibit a flare-up light, but that the collision was due to the fault of the steamer, in failing to sooner discover the schooner, and, on discovering her, in attempting to cross her course, in direct violation of navigation rule 22.

Hobbs & Gifford and J. Parker Kirlin, for libelant Cole and the schooner Robert Graham Dun.

Maxwell Evarts and Robert D. Benedict, for the steamship Excelsior.

THOMAS, District Judge. These actions involve cross libels filed to recover damages sustained by the schooner Robert Graham Dun and by the steamer Excelsior in a collision off the New Jersey coast about 1:30 a. m. of August 3, 1899. The schooner was a wooden vessel, about 160 feet in length, 34 feet 10 inches in beam, and was bound from Savannah to New York, with a cargo of lumber. The Excelsior was an iron steamship, 370 feet in length, and 46 feet in beam, and was bound with a cargo from New York to New Orleans. Her draft was 18 feet 11 inches forward, and 21 feet 11 inches aft. The wind was light from S. W. to S. W. by S. The schooner was sailing wing and wing, at the rate of about 3½ or 4 knots per hour, upon a course of N. E. by N. The steamer was making about 12 knots per hour, upon a course of S. by W. ¾ W. Those on the schooner regarded the steamer's course as about S. S. W., while those on the steamer took the schooner's course to be about N. E. The night was dark, but clear and favorable for seeing lights. On the deck of the schooner were the master and three men. Two men were forward,—one on the lookout and another standing by. One was at the wheel, and the captain was near him. It is claimed by the schooner that the masthead light of the steamer was sighted, bearing about a point and a half on the port bow, at an estimated distance of about 5 or 6 miles. Thereafter a red light was seen for some minutes on the steamer, bearing in the same direction. Then the green light appeared, and all of the steamer's lights were seen for a brief time, bearing in the same general direction. Then the red light disappeared, and very soon thereafter the bows of the steamer and of the schooner collided, at an angle of about 12 points between the steamer's starboard side and the schooner's port side, and of about 4 points between the courses on which they had been heading previous to the maneuver of the steamer, which, it is alleged by her, was intended to prevent the accident. The schooner kept on an unchanged course. The first officer was at the starboard quarter window in the pilot house, and the quartermaster was also in the pilot house, at the wheel. The lookout was forward in the bow of the ship. At about 1:30 a. m. the lookout reported, "A red light right ahead," repeating this report three times in quick succession. Thereupon the mate took his night glass and looked first off to the starboard side of the steamer, then swept his glass forward, and saw first the sails of the schooner. He was standing on the starboard side of the house, and he saw the schooner's mast close to the right of the steamer's stem. This officer judged that the schooner was then about 1,800 feet away, and he ordered his helm hard a-starboard. He stated that after he had opened the schooner out about 2 points or more on his starboard bow, and about 60 seconds before the collision, he saw her red light, then about 1,200 feet off; that he continued under a hard a-starboard helm at full speed. He claimed that he sighted the schooner about

80 seconds before the collision. He states that the steamer steers well and quickly, and swings 6 points in 82 seconds; that, as she was trimmed and laden that night, she would swing 4 points, or from S. S. W. to S. S. E., in from 40 to 50 seconds; and, although he did not look at the compass, he estimates that she swung between 3 and 4 points on the starboard helm.

The evidence of those on board the schooner shows that she had the usual lights, and that they were suitable. This evidence is confirmed by the general evidence on the part of the steamer, although she offered some evidence to the effect .that such lights were dim. The lookout of the steamer, whose intoxication at the time of trial impaired his value as a witness, reported the red light three times, as he says, although he seemed to suggest that the light intermitted. The chief officer of the steamer then attempted to locate the vessel ahead, and did so by sails, but did not discover the lights until the steamer had opened out 2 points. It is urged that, although the light existed, the failure of the first officer to see the same was due to the interposition of the staysail, which intercepted his view when the vessels were in their earlier relation. But the schooner was sailing wing and wing, with a light wind, and it is inconceivable that the staysail was other than amidships, as the sea was not sufficiently disturbed to alter its usually expected location. Moreover, the evidence is quite complete that the staysail was so mechanically detained that it could not conceal the lights, and it is not believed that it did. The steamer charges that the fault of the schooner was (1) dim or obscured light; (2) omission to exhibit a flare-up light. The conclusion that the schooner's light was neither dim nor obscured must be followed by a finding that it is not chargeable with fault for omission to exhibit the flare-up light. The rule permits the use of a flare-up light, but does not make it obligatory upon the schooner, unless perchance the circumstances were such that prudence would require it. It is true that those on the schooner saw the vessel for a long time before the collision, and when the wheel of the steamer was put hard a-starboard those on the schooner saw the steamer swing to port, and continue to swing to port until the accident happened. But the steamer did not begin to swing to port, nor to deviate from her former course, until after the steamer had discovered the schooner. Therefore there was no occasion for exhibiting a flare-up light after the steamer's helm was put hard a-starboard, and her course lay directly across the course of the schooner; and there was no occasion for a flare-up light previous thereto, because there was no previous appearance of probable collision. The first officer of the steamer states that he saw the schooner when the vessels were 1,800 feet apart, and that he made the deviation which has been stated. At the rate of 12 miles an hour, the steamer would travel 1,320 feet in 1¼ minutes, and the schooner, at the rate of 4 miles an hour, would travel during the same time 430 feet; making a total separation of 1,750 feet, or, approximately, the 1,800 feet which separated the vessels when the first officer first saw the schooner, according to the estimate given by him. Hence it was only during the space of about 1¼ minutes that those on the schooner could have

known or could have appreciated that the steamer was attempting to cross the course of the schooner. Preceding that time there was no occasion for exhibiting the flare-up light, inasmuch as those on the schooner saw the red light of the steamer, and those on the steamer saw the red light of the schooner; and there was no occasion for the flare-up light thereafter, as the schooner was then discovered by the steamer. Therefore it is concluded that the schooner was not at fault on either of the grounds alleged by the steamer. That the steamer was in fault is obvious. In the first place, showing her own red light to the apparent red light of the schooner, the steamer starboarded and attempted to go across the schooner's course. Article 22 provides:

"Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."

It was the duty of the steamer to keep out of the way of the schooner, and the way selected by her for complying with this obligation was to attempt to cross ahead of the schooner, in palpable violation of the rule. In order to do this, the steamer was swung at least 3 points to port from her previous course. The chief officer excused this maneuver by the statement that when he saw the schooner she was on his starboard rather than his port side. The first officer says that when he first saw the schooner her foremast was about 3 feet to the right of the stem, and that he was then standing 8 feet on the starboard side of the amidships, in the pilot house. It is pointed out by the learned advocate for the schooner that a line drawn from the point where the first officer was standing, and passed 3 feet to the right of the stem, and carried 1,800 feet, would have passed well over on to the Excelsior's port bow. However this may be, if the vessels presented to each other their red lights, and the schooner's foremast was in the line stated, and some 1,800 feet away, there was no excuse whatever for heading the steamer across the schooner's course. Such starboarding inevitably tended towards collision. The schooner shows, and the fact appears to be, that the schooner was on the port side of the steamer, with about 1 point between their courses; the course of the former being about S. S. W., and that of the latter N. E. by N., with an interval of 1,800 feet. If the steamer could swing nearly 4 points to port, it could have swung sufficiently to starboard, it is apprehended, to escape the collision. But, if the officer of the steamer had doubt of his ability to escape the collision by porting, then there was apparent reason for observing article 23, which provides:

"Every steam vessel which is directed by these rules to keep out of the way of another vessel, shall on approaching her, if necessary, slacken her speed or stop or reverse."

It is urged in behalf of the steamer that there was no necessity for stopping or reversing. It may be that there was no such necessity, but such necessity did exist if the only alternative was the desperate one of attempting the impracticable maneuver of crossing the schooner's bow. But, if the steamer was in a situation so peril-

ous to herself and to the schooner that she had no recourse save the attempt to cross the schooner's bow, the final question arises, by whose fault had the steamer been brought into that situation? For a long distance away the steamer's lights had been observed by those on the schooner, and no reasonable excuse is offered for the failure of those on the steamer to discover the lights of the schooner until the vessels were near together. The lights were there, they were burning, and it is believed that they were not obscured. The court is impressed by the evidence and by the demeanor of the witnesses for the steamer that suitable care in keeping a lookout was not maintained. It was noticeable in this case, as it has been in many others, that the person selected for the lookout on large steamers is frequently unsuitable; and the lookout of the steamer in the present case, if his appearance at the trial was illustrative, was palpably an incompetent and improper person. The position is one requiring great fidelity, attention, and care, and no prudent person would commit a trust of so responsible a nature to the man who was presented to the court as the lookout. The first officer, as he appeared to the court, merits the commendation of an honest-appearing witness; and it may be that, in the discharge of many of the duties that would fall to such a man, he would be an entirely competent person. But his knowledge of the rules governing the suitable action of vessels under such circumstances was noticeably of a limited range, and his excuse for starboarding and attempting to cross the bows of the schooner, upon the plea that it would have been necessary for him to have changed his course 12 points had he attempted to go to starboard, indicates such deficiency in seamanship that the conclusion is necessarily reached that for some reason he had been inattentive to the trust which had been reposed in him, and had failed to timely discover the situation which he should have discovered, and that, when he found his vessel in a dilemma arising from such inattention, he adopted a maneuver that was quite violative of the applicable rules.

It is concluded that the schooner was justified in holding her course,—indeed, she is not accused for doing so; that her lights were suitable and were not obscured; that they could have been discovered seasonably if there had been proper lookout on the steamer; that the schooner was under no obligation to exhibit the flare-up lights, and that no emergency requiring that act arose until after she was discovered by the steamer; that when the vessels came into close proximity the steamer improperly attempted to cross the bows of the schooner, when the allowable and safer maneuver to starboard was practicable. It follows that the libel filed against the schooner should be dismissed, with costs, and that there should be a decree against the steamship Excelsior, in favor of the owners of the schooner, for the damages sustained by the schooner, together with the costs of the action.