### THE FURNESSIA.

#### (Circuit Court of Appeals, Second Circuit. April 30, 1907.)

#### No. 216.

COLLISION—STEAM AND SAILING VESSELS CROSSING—ERROR IN EXTREMIS.

A collision at sea on a foggy night between a schooner and a steamship on crossing courses was brought about primarily by the fault of the steamer in maintaining an excessive speed in the fog, and not keeping an efficient lookout, in consequence of which she was close upon the schooner before she saw her or heard her fog signals. Just prior to the collision, the mate of the schooner took the light from the binnacle and placed it on top of the house, where it was mistaken by the steamer for the stern light of an overtaken vessel, in consequence of which the

steamer ported when she should have starboarded, and thus made collision certain. *Held*, that such act of the mate did not render the schooner liable as for a contributory fault, because it was done in extremis, when the steamer was bearing down directly upon the schooner at high speed, apparently without seeing her.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 225–229.

Collision rules, speed of sailing vessels in fog, see note to The Mount Hope, 29 C. C. A. 368.]

Appeal from the District Court of the United States for the Southern District of New York.

The cause comes here upon cross-appeals from a decree of the District Court, Southern District of New York, holding the steamer Furnessia solely in fault for a collision with the schooner William Bisbee. The steamer appeals on the merits, and libelants upon the assessment of damages. The witnesses on the merits were all examined out of court. The collision happened about 1:45 a. m. May 15, 1904, in the Atlantic Ocean, some 15 miles east of Fire Island lightship. The opinion below is reported in 137 Fed. 955.

Henry G. Ward, Wm. S. Montgomery, and Robinson, Biddle & Ward, for claimant.

W. U. Taylor and MacFarland, Taylor & Costello, for libelant.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

LACOMBE, Circuit Judge. The steamer was on a course W. by N. two degrees N. The schooner in charge of her mate, who was at the wheeel, was on the starboard tack, heading nearly northeast, with a very light wind from the eastward. She at no time changed her course. The steamer struck her a right-angled blow. Therefore before collision the steamer must have changed her course nearly four points. The weather was foggy. Fog whistles were sounded by the steamer, and the schooner was working her mechanical fog horn. The District Court held the steamer in fault for going at too great speed in a fog, and in not having sufficient lookouts. She does not contest the correctness of this finding. As was to be expected, the powerful electric lights (masthead and colored) of the steamer were visible to those on the schooner before her own lights could be made out by those on the steamer. Exactly what lights were first seen by the schooner is by no means certain, although both mate and lookout insist that they first saw the masthead and green light. We find it impossible to reconcile such a statement with the known courses of both vessels, prior to the change of course which the steamer made later, when she made out the presence of the schooner. But, whatever lights were seen, the schooner obeyed the rules in maintaining her course and speed unchanged until the crash came.

The district judge says:

"The difficult question in the case is concerning the exhibition of an irregular light by the schooner. When the steamship's presence became known to those on the schooner, the mate, who was then in charge and steering her, took the light out of the binnacle and set it on top of the house, where it

remained until nearly the time of the collision, when it was put back in the binnacle. The mate explains this by stating that he was afraid of steamers, and always used this precaution. It was very bad practice on his part, and, if it had any effect in producing collision, the vessel should be condemned for it. The steamship claims that she supposed that the light was one of an overtaken vessel shown in conformity with article 10 of the sailing rules."

He excused the schooner (1) because it was doubtful whether the steamer changed her course, by reason of the misleading light, sufficiently to bring about collision; and (2) because the exhibition of that light was in the extremity of collision.

In the first of these propositions we are unable to concur. There is no testimony and no conceivable reason why the steamer should have changed her course before she saw the schooner's light. She had laid her compass course at Nantucket lightship for Fire Island lightship, and only the presence of some other vessel to be avoided would have induced a departure from it. The light first seen was a white light a little on the port bow. The captain and the second and fourth officers, all on the bridge, so testify. The lookout in the crow's nest (called by libelants) says that he heard the lookout at the bow report "light on the port bow," and soon thereafter he himself saw a white light right ahead. All of these witnesses saw a green light a little later, but the helm had been already ported in the belief that the white light was displayed by an overtaken vessel. One witness only, the lookout in the bow, also called by libelant, testified that he first saw a green light on the port bow. His evidence is unpersuasive. When confronted with a contradictory statement which he had signed, he sought to explain it away by saying that he was drunk when he signed it. This explanation was disproved by several persons who were present at the time. Moreover, he insists that he warned them on the bridge by singing out that "he had better put his helm hard down, otherwise he would go right into the schooner." If he did see a green light a little on the port bow or about ahead, this was a manoeuvre certain to produce disaster. Further questioning apparently warned him of the effect of this testimony, for he states that by "hard down" he meant "hard astarboard." Since the wind at the time was coming over the starboard quarter, the explanation is a lame one, and we think his whole testimony entitled to no credit. It seems to us well established that the white light did mislead the steamer, and that if she had not ported to pass it, but had made no change till the green light became visible, she could then have starboarded and passed in safety.

With some doubt, however, we concur in the conclusion that the exhibition of the binnacle light is to be excused because it was in extremis. Counsel for the steamer contends that there are serious contradictions in the testimony of the mate of the schooner; but, upon a careful analysis of the evidence, we think they are more apparent than real, and are satisfied that he did not exhibit the binnacle light till just as he called the captain, when for some little time the steamer, showing her mast-head and red light and some lights through the dead lights on her port side, was bearing down on him apparently unconscious of the schooner's proximity. There are sufficient instances

in the reports of steamers navigating the North Atlantic in fog at a rate of speed too great to enable them to discover the presence of privileged vessels in time to avoid them to insure the court's appreciation of the mate's remark, "Every time I see a steamer, I think she is going to run into us." No antecedent fault on the part of the schooner had produced the perilous situation. She was sounding her fog horn, a good one, and kept her course and speed until the end. The apparent risk was induced by the fault of the steamer in running in a fog so thick (as the second officer says) that a light could not be seen until less than the ship's length away, and at a rate of speed so high that she was almost on top of the schooner before her navigators heard the fog horn. Under these circumstances, we are not inclined to hold the schooner in fault because the mate, terrified in the presence of impending peril, lost his head so completely as to do the one thing which made the threatened catastrophe certain.

As to the damages the commissioner has followed the authority of La Champagne (D. C.) 53 Fed. 398, which lays down the rule to be followed in similar cases. As to minor criticisms of his findings, we concur with the district judge that they are without merit.

The decree is affirmed, with interest; but, since both sides appealed, without costs of this appeal.