## THE CHEPSTOW CASTLE.

### UNION–CASTLE MAIL S. S. CO., Limited, v. PENDLETON SHIPBUILDING & NAV. CO. et al.

(District Court, D. Massachusetts.   August 9, 1916.)

Nos. 1469, 1476.

1. COLLISION ⬅️49—FAILURE TO CHANGE COURSE—EVIDENCE OF FAULT—SUFFICIENCY.

In suit for collision between steamer and schooner, evidence *held* to show that latter was not at fault for holding its course after steamer had made sudden change of course toward it.

2. COLLISION ⬅️49—SCHOONER'S LIGHTS—SUFFICIENCY OF EVIDENCE.

In suit for collision between steamer and schooner, evidence *held* to show that latter's lights were properly set and burning and were not obscured by her sails.

3. COLLISION ⬅️48—SCHOONER AND STEAMER—BURDEN OF PROOF.

Where a sailing vessel carrying proper lights was run down at sea by a steamer on a night when the seeing was good, the latter has a heavy burden to show itself not at fault.

4. COLLISION ⬅️45—SCHOONER AND STEAMER—SHOWING OF FLARE.

Where steamer changed her course so as to head more toward a schooner, making it appear to master of latter that it was being overlooked, the latter was not at fault in showing flare light.

5. COLLISION ⬅️49—SCHOONER AND STEAMER—SUFFICIENCY OF EVIDENCE.

In suit for collision between schooner and steamer, evidence *held* to show that latter was at fault for failing to slow or stop seasonably and for failing to discover and keep clear of former.

In Admiralty.   Libel by the Pendleton Shipbuilding & Navigation Company against the steamship Chepstow Castle, with cross-libel by the Union-Castle Mail Steamship Company, Limited, against the Pendleton Shipbuilding & Navigation Company and others.   Decree adjudging the Chepstow Castle solely at fault, and referring the case to an assessor to state damages, and cross-libel dismissed.

Case No. 1469:

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for libelant.

Kirlin, Woolsey & Hickox, of New York City, and FitzHenry Smith, Jr., of Boston, Mass., for claimant.

Case No. 1476:

Kirlin, Woolsey & Hickox, of New York City, and FitzHenry Smith, Jr., of Boston, Mass., for cross-libelant.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for respondents.

MORTON, District Judge.   These two cases arise out of a collision on the high seas, about 15 miles southwest of Winter Quarter Shoal lightship, off the Virginia coast, between the three-masted schooner Emma F. Angell and the steamer Chepstow Castle.   The collision occurred about 2:25 a. m. on the morning of April 8, 1916.

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The schooner sank almost immediately. · Her crew were saved. The first case is a libel by her owners to recover damages for her loss. There is a cross-libel by the owners of the Chepstow Castle to recover for the damage to her.

The night was overcast and dark, with occasional squalls, but no fog or mist. The seeing was good. The wind was moderate to fresh, about southeast. The schooner was headed about south southwest, on the wind, but not quite closehauled. She was bound to Norfolk. She was carrying substantially all sail, including four head sails.

The Chepstow Castle is about 425 feet long and of about 5,000 net tons. She was proceeding in a northeasterly direction at full speed, about 10 knots per hour. There was a difference of about two points from a straight line in the courses of the vessels as they approached each other, the schooner having the steamer on her starboard bow and their courses intersecting.

The steamer was first seen from the schooner when about three miles distant. Shortly afterwards she was observed to change her course slightly towards the schooner, plainly showing her red light against the schooner's green. The master of the schooner inferred from this maneuver on the part of the steamer, and from her failure to make any further change of course to avoid his vessel, that the schooner was being overlooked by the steamer. In order to attract her attention he showed a bright flare light aft on his starboard rail. The steamer held her course, which was one involving danger of collision. The master of the schooner then swung an ordinary white lantern on the schooner's starboard quarter. As the steamer still made no change in direction or speed, he ordered the whistle of the donkey engine to be sounded.

About this time the steamer was observed to swing sharply to starboard and head almost directly across the schooner's bow. The vessels were then pretty close together. The schooner held her course for a short time until it became evident that a collision was unavoidable. Then her helm was put down and an effort made to bring her into the wind, which would be towards the southeast. Almost immediately after this was done the steamer, then heading approximately east, struck the schooner about opposite the spanker rigging and cut almost through her. Her crew got into the boat, and the schooner sank within a very few minutes.

The navigation of the steamer was, at the time, in charge of her second officer. She had one man on lookout, who was stationed in the crow's nest; the officer was on the bridge, and with him there was the helmsman. There were two other men in the watch who were not assigned to special duty. Her captain came on the bridge after the emergency had arisen and before the vessels came together. The testimony of the witnesses for the steamer is not entirely harmonious, but the account of the accident given by them may be summarized as follows:

The steamer's course was laid for the Winter Quarter Shoal lightship, and the officer on watch was looking out for that light. About 15 minutes before the collision he saw what he took to be a gleam

of it below the horizon. He took a cross-bearing of another light on shore, which was about on his port beam, and then went to the chartroom to put the steamer's position on the chart. He reported the lightship to the captain as dead ahead, and received orders to keep it slightly on the port bow. The steamer thereupon changed her course about half a point to starboard. This was the change which, as above mentioned, was observed on the schooner shortly after the steamer was sighted. When the officer returned to the bridge the gleam of the lightship was no longer visible. He was somewhat puzzled by its disappearance, and began sharply to look for it, using field glasses and scanning that part of the horizon. Some minutes later his attention was attracted by a bright light about on the range where the light vessel had been. It was, however, much closer at hand than the light vessel would have been if his location of his vessel were correct. He testified that he recognized the light as being a flare light, that he thought he had overrun his course and was close to the lightship, and that he supposed the lights on the lightship had given out and she was showing a flare to warn him to keep off. What he did, as he says, was to put his helm hard aport, swinging the steamer towards the east. According to the testimony of the helmsman on the steamer this change of course was not made until some time after the flare had disappeared. It was observed on the schooner, as above stated. The danger whistles from the schooner were heard on the steamer—a succession of short blasts on the steam whistle. There was, however, no reduction in the steamer's speed. The lookout very soon reported a sailing vessel dead ahead, and the green sidelight of the schooner was for the first time observed on the steamer. At this juncture the captain of the steamer came on the bridge. He says that the schooner was then 300 or 400 yards distant; other witnesses on the steamer put it much less—as short as half her length, i. e., about 215 feet. He at once ordered the engines reversed. No change was made in the helm, which was hard aport. The steamer slid forward, still swinging, and collided with the schooner, as above described.

The steamer asserts that the collision occurred wholly because of the fault of the schooner, and alleges three principal faults: (1) That the schooner's green light was not brightly burning or was obscured by her headsails; (2) that the display of the flare light by the schooner was a fault which misled the steamer and contributed to the accident; and (3) that the schooner negligently held her course when by changing it she could have avoided the collision.

[1] As to the last alleged fault, I am of opinion, for reasons which I stated orally at the conclusion of the arguments, that it is not established. The situation in which the schooner found herself after the steamer's last and sudden change of course towards her was a desperate and confusing one. The steamer was both swinging and slowing. Even after the event, gentlemen equally well qualified to form an opinion disagree as to what the schooner should have done, certain expert witnesses saying that she should have luffed, and the steamer's counsel that she should have kept off. The lookout on the

steamer says there was not time for the schooner to change her course after she was seen from the steamer. The master of the schooner was, in my opinion, entirely right in holding his course as long as he did. If he had done otherwise, his action would certainly have been charged against his vessel as a grave fault if a collision had occurred.

[2] The questions as to lights are more difficult. The steamer contends that the schooner's side light was either dim or obscured, and that it did not meet the requirements of law. This contention is founded upon the testimony of the lookout, the officer on watch, and the helmsman of the steamer, who being, as they say, attentively watching the sea ahead, entirely failed to discover the green light until it was too close at hand for them to avoid a collision. And this testimony is further strengthened by that of other persons on the steamer who happened to be on deck and to look ahead during the time when the schooner's light ought to have been visible and who did not see it. On the other hand, some of these same witnesses, among them the lookout, also testified that when they noticed the schooner's light, just before the collision, it appeared to be all right and to be burning brightly.

The evidence for the schooner satisfies me that she was being navigated with more than ordinary care. Her master became apprehensive about the steamer while the latter was still a considerable distance away. He testified that he directed the man on lookout to inspect the schooner's lights, and that the lookout reported them all right. The lookout, who was called as a witness, corroborates this testimony. It is certain that a flare light was shown, and that by her master's order the steam whistle on the schooner was blown in further efforts to attract the steamer's attention. The whole evidence for the schooner, which at various points is corroborated by witnesses on the steamer, indicates that considerable uneasiness in regard to the steamer's conduct was felt by those on board the schooner, and that a high degree of vigilance was being exercised. Under such circumstances, it seems wholly natural that her lights would be inspected. I therefore attach more importance than I might under different circumstances to the testimony of her officer and crew as to the condition of her lights. Just before the collision her green light was properly burning and was seen from the steamer. There is not a suggestion in the testimony that anything was done to it while the vessels were approaching each other. As to the testimony of the second officer of the steamer and his failure to see the schooner's lights, in another case recently tried before me, an officer using glasses in an effort to pick up a light vessel just beyond the horizon overlooked, as I thought, a sailing vessel close at hand. The Surf, 230 Fed. 485, 488. It is by no means impossible that that occurred in this case also. The helmsman's attention was on his course and compass. His failure to see the schooner's light affords no strong evidence that the light was not visible. The lookout's testimony is significant, but is outweighed by the other evidence in the case. I find that the schooner's lights were properly set and burning.

It is further suggested on behalf of the steamer that the green light, although properly burning, may have been obscured by the head sails. This is an easy suggestion to make, and one not infrequently offered on

behalf of a vessel which has overlooked the lights of another vessel approaching nearly head-on. In this case it is repelled by the unanimous testimony of the men on the schooner, and also, as I think, by the circumstances of the case. The vessels were not approaching head to head, but at an angle, the steamer being pointed ahead of the schooner and across her bow. She never did cross the schooner's bow. The schooner's head sails would have had to be far out to obscure her lights under such conditions. The schooner's course, with reference to the wind, was such as to make it wholly unlikely that her head sails would be slacked way off. I find that her green light was not obscured by her sails.

[3] We have then the case of a sailing vessel, carrying proper lights, run down at sea by a steamer on a night when the seeing was good. The mere statement of the accident obviously throws a heavy burden of explanation upon the steamer to exculpate herself. The final contention made on her behalf is that the schooner was at fault for showing the flare. The flare burned with an intense white light lasting about two minutes. While it was burning I have no doubt that it was impossible on the steamer to make out the schooner's green light. The vessels were coming together at the rate of about 15 knots an hour. It is evident that for a considerable distance the steamer was, by reason of the schooner's conduct in showing the flare, left without information as to the schooner's direction.

I see no sufficient reason to doubt the correctness of the statement of the law as to flare lights recently made by me in Russell v. S. S. Middlesex, 253 Fed. 142 (District Court Mass. June 13, 1916), in which it was said that—

"Additional warnings of this character are intended to be used either to attract the attention of an approaching vessel which has apparently overlooked the vessel resorting to it, or to warn an approaching vessel when she cannot otherwise be expected to locate accurately the place of the vessel showing the flare."

[4] There is no doubt that the flare was not shown until after the steamer had changed her course so as to head more towards the schooner. The master of the schooner then displayed the flare, which was seen on the steamer; he then swung the lantern, which was not seen on the steamer; he then blew his steam whistle, which was heard on the steamer. His supposition that he was being overlooked when the flare was shown was correct. If it was not displayed until the vessels were fairly near together, as would be inferred from the testimony of some witnesses on the steamer, there is no sufficient explanation for her previous failure to see the green light, and the showing of the flare was, I think, justified. If, on the other hand, the flare was shown fairly early in the approach of the two vessels, as would be inferred from the testimony of the master of the schooner and some witnesses on the steamer, there remained ample time, after the effect of it had disappeared, for the steamer to have seen the schooner and to have avoided her. Some latitude must certainly be given to the judgment and action of a shipmaster in matters of this sort, and I am not prepared to say that the schooner was at fault for having shown the flare.

. Another point, although not necessary to the decision of the case, perhaps ought to be referred to. Before the schooner was seen from the steamer repeated short blasts of the former's steam whistle, plainly saying danger, were heard on the steamer, and yet the engines were not even slowed. She was kept at full speed until the captain reached the bridge, and his first act on getting there was to order them hard astern. This delay was not unimportant, because, if the steamer had been slowed down a short time sooner than she was, and other things had remained the same, the schooner would have crossed the steamer's bow and got clear.

[5] The steamer was at fault for failing to slow or stop seasonably, as well as for failing to discover and keep clear of the schooner. The schooner was free from fault.

There must be a decree in the first case adjudging the Chepstow Castle solely at fault for the collision and referring the case to an assessor to state the damages, and in the cross-libel a decree dismissing the libel.