## THE LAFAYETTE (five cases).

### Appeals of COMPAGNIE GENERALE TRANSATLANTIQUE.

(Circuit Court of Appeals, Second Circuit. November 10, 1920.)

Nos. 15–19.

**1. Collision ⬳99—Steamship in fault for running down sailing yacht.**

A steamship, which, when going at a speed of 14 miles in New York Bay on a calm, clear, moonlight night, ran down and sank a small sloop yacht on a crossing course and carrying proper lights, *held* in fault for not keeping an efficient lookout; the yacht, which kept her course and speed, as required by the rules, *held* not in fault for not showing a flare, as permitted, but not required, by article 12 of the Inland Rules (Comp. St. § 7885), her navigator, who saw the steamship when two miles away, having the right to suppose, until too late to prevent collision, that she also saw his vessel and as the burdened steam vessel would keep out of his way.

**2. Collision ⬳49—Steamer in fault must make strong case against sailing vessel.**

Where a steam vessel was clearly in fault for a collision with a sailing vessel, a strong case must be made out, if the sailing vessel is to be held also in fault.

**3. Collision ⬳108—Unskillful navigation in extremity not fault.**

If one vessel places another in a position of extreme danger through wrongful navigation, the other is not to be held in fault if she is not navigated with perfect skill and presence of mind.

**4. Negligence ⬳93 (1)—Contributory fault of navigator not imputed to passengers.**

The negligence of the navigator of a private yacht, contributing to a collision, cannot be imputed to other persons on the vessel by his invitation, but who had no control over its management.

**5. Admiralty ⬳51—Suit in rem for personal injuries in collision does not abate by death of libelant.**

A suit in rem against a vessel for personal injuries sustained in a collision does not abate by the death of the libelant.

**6. Admiralty ⬳26—Rights arising from maritime tort governed by maritime law.**

A suit in rem arising out of a maritime tort, giving rise to a maritime lien, is not subject to the rules of the common-law courts, nor to state statutes.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeals from the District Court of the United States for the Southern District of New York.

Separate suits in admiralty for collision by Augustus S. Meeker, by G. Malcolm Knox, by Harold Haas, by Charles Haas, as executor of Henry Haas, deceased, and by Augustus S. Meeker, as administrator of Mary Agnes Meeker, against the steamship Lafayette; the Compagnie Generale Transatlantique, claimant. Decrees for libelants, and claimant appeals. Affirmed.

Joseph P. Nolan, of New York City, for appellant.

Choate, Larocque & Mitchell, of New York City (Joseph Larocque, of New York City, of counsel), for appellees.

Before WARD, ROGERS, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. The five cases grew out of the same collision, were tried together, were argued in this court together, and will be now determined in one and the same opinion. These cases arose out of a collision in New York Harbor on the night of August 20, 1916. The collision was between the steamship Lafayette and the sloop Drifter, which was struck on the starboard side just forward of the cockpit and cut through, dividing her into two parts and causing her to sink immediately. The libelant Meeker was the owner of the sloop yacht Drifter. She was 34½ feet in length, and her beam was 11½ feet. She is described as having been a heavily built boat, with oak timbers and a cedar bottom. The jib was rather small, and the mainsail was a very large one.

The steamship Lafayette is an ocean-going steamship, registered under the laws of the republic of France, and engaged in the carriage of mails and passengers between ports in France and the port of New York. The steamship is owned by the Compagnie Generale Transatlantique, which filed a petition under the fifty-ninth rule (29 Sup. Ct. xlvi).

The libelant Meeker, who was engaged in business in New York City, was accustomed in the summer, after business hours, to sail his boat in the evening, and to sleep on board her at night On the afternoon of August 20, 1916, he left Bensonhurst Yacht Club, in Brooklyn, about 4:30 o'clock for a sail on the yacht. He was accompanied by his wife and his nephew, Malcolm Knox, and by two friends, Henry Haas and the latter's son, Harold Haas. At about 7 p. m. the Drifter put into South Beach, where she remained for one hour. She started to return to Bensonhurst at 8 p. m., and her side lights had been set and were burning brightly, and so continued at the time of the collision. They were the regulation lights; the green light on the starboard side, and the red light on the port side. They were placed on the side and at the top of the after end of the cabin, about 7½ or 8 feet above the water. At 11 o'clock the libelant's wife, his nephew, and Henry Haas went below to the cabin to rest, while Harold Haas lay down on the seat in the cockpit and went to sleep. The libelant Meeker was at the wheel, and from the time he left South Beach to the time of the collision he made no change in the wheel, and kept his jib and mainsail

flying all the time and his bow pointing straight at Norton's Point Light. At about 11:30 he saw what proved to be the Lafayette approaching as he testified from a direction slightly forward of abeam. When he first saw the Lafayette, she was two or three miles away, and at that time he could see both her side lights, starboard and port, and up to the moment of collision, according to his testimony, he was able to see both her lights, and during the entire period the steamer kept going on straight.

On the night in question the moon was shining, the sky was clear, and the wind was practically calm. There was no fog. The records of the Weather Bureau recorded no haze, and if there had been a haze sufficient to obscure vision it would have been recorded. The pilot of the Lafayette was asked as to the weather conditions, and testified that it was a pleasant night. The following is an excerpt from his testimony:

"The Court: What is your recollection of the other weather conditions? A pleasant night?

"Witness: A pleasant night.

"The Court: A nice warm evening?

"Witness: Beautiful.

"The Court: Any moon?

"Witness: Yes, sir.

"The Court: The moon showed up well?

"Witness: Yes, sir. About half or three-quarters of a moon; no fog or haze; there was a slight haze on the water.

"The Court: Any haze that prevented seeing lights, if they were good lights?

"Witness: No; I had no trouble in seeing anything; if there was any light, I would have seen it immediately, if it had been shown in my direction."

And:

"Q. Did you see this Drifter before the Lafayette came into collision with her? A. Just the moment before that.

"Q. How did you discover that there was this vessel before you finally struck her? A. I was keeping a very sharp lookout ahead and on both bows for some small boat that might be there, and I discovered a small, dark object about a point on the bow. Immediately I ordered the engines half stopped, helm hard aport; I spoke French, that's the only French I do know, 'Babord' and 'Tribord,' I said 'Tribord tout,' which means, in English, 'Hard aport.'

"Q. That would make her head swing to starboard? A. I told them to stop the engines; I myself took the starboard telegraph and stopped; and the officer took the port telegraph and we stopped full speed astern at once; and we stopped the engines again as quick as I can tell the story.

"Q. Did you see any light on this vessel before you struck her? A. After I'd given the order 'Tribord tout,' I discovered the green light.

"Q. Before that, was she showing any light? A. I did not see any light before that; only the sail.

"Q. Could you distinguish the sail? A. I saw a dark object; I couldn't see what it was.

"Q. How close were you to the dark object when you gave this order, 'Tribord tout'? A. I should say from between 500 to 1,000 feet; I should judge that, I wouldn't say positively, he was going so quickly.

"Q. The Lafayette was making good speed? A. Pretty good.

"Q. About what, would you say? A. I should say, well, probably 12 through the water.

"The Court: And the tide with you?

"Witness: Yes, sir; through the water.

"The Court: Then you were making that and the tide?

"Witness: And the tide.

"Q. Twelve miles plus the tide? A. Yes, sir; the tide runs probably one knot or a knot and a half."

The evidence shows, however, that the Drifter's lights were properly set and burning, as required by the Act of Congress, approved June 7, 1897. 30 Stat. p. 96, c. 4 (Comp. St. §§ 7874–7909). The above act, in article 20 (section 7894), provides that—

"When a steam, vessel and a sailing vessel are proceeding in such directions as to involve risk of collision, the steam vessel shall keep out of the way of the sailing vessel."

And article 21 (section 7895) provides that—

"Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed."

[1] The Lafayette should have seen the Drifter, and the fact that she did not discover her until just before the collision shows that she did not have a proper lookout. She cannot exculpate herself under the circumstances of this case upon the plea that she did not see her. She was in fault in not seeing her, and in fault in not keeping out of the Drifter's way; and her fault in this case is clear and gross, and she must answer in damages therefor.

But it is said that the libelant Meeker, who owned the Drifter, was not free from fault and should not be entitled to recover more than half damages. It is said that he saw the Lafayette 10 minutes before the collision, and that she must have been at that time 2 or more nautical miles away, and that he did nothing until just before the collision, when, seeing that a collision was inevitable, he screamed to those who had gone below to sleep in the cabin, "For God's sake, jump!" It is said that he should have shouted to the steamer or burned a flare light to have attracted her attention, when he saw that his boat was not observed, and that he could not have had in mind article 10, or article 12, or article 27 of the Rules (sections 7883, 7885, 7901), which appear in the margin.[1] But the Drifter was a privileged vessel, and it was her right and duty to keep her course and speed, and Meeker had the right to assume that the Lafayette would obey the law and not run him down.

Article 10 applies to a vessel which is being overtaken, and the Drifter was not an overtaken vessel. Whether articles 12 and 27 have application to the facts of this case will be considered presently. The only other article which in express terms refers to a flare-up light is

[1] Article 10: "A vessel which is being overtaken by another, except a steam vessel with an after range light showing all around the horizon, shall show from her stern to such last-mentioned vessel a white light or flare-up light."

Article 12: "Every vessel may, if necessary, in order to attract attention, in addition to the lights which she is by these rules required to carry, show a flare-up light or use any detonating signal that cannot be mistaken for a distress signal."

Article 27: "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

article 8 (section 7881) and that portion of it which relates to that subject may be found in the margin.[2] That article relates to pilot vessels, and it is without application to the Drifter.

Articles 12 and 27, as found in the Act of June 7, 1897, were not incorporated into the regulations for the first time in that act, but are found in totidem verbis in the Act of August 19, 1890, c. 802, 26 Stat. p. 320 (Comp. St. §§ 7837–7870), and were in force therefore when the case of The Oregon, 158 U. S. 186, 15 Sup. Ct. 804, 39 L. Ed. 943, about to be considered was decided by the Supreme Court in 1894. But the collision in that case occurred in December, 1889, and the court, in deciding it, assumed that the Code of 1864 applied to it. 13 Stat. c. 69, p. 58. That Code required sailing vessels to carry, as now, a green light on the starboard side, and a red light on the port side. And article 20 provided:

"Nothing in these rules shall exonerate any ship, or the owner, or master, or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

The court held that the failure to use a torch under the circumstances of the case did not constitute neglect of any precaution required by the ordinary practice of seamen or by the special circumstances of the case.

In The Oregon, 158 U. S. 186, 15 Sup. Ct. 804, 39 L. Ed. 943, a collision had occurred between the British ship Clan Mackenzie, a sailing vessel, and the steamer Oregon, in the Columbia river, which resulted in the sinking of the Clan Mackenzie. The latter boat at the time of collision was at anchor on the edge of the ship channel, which at that point, was nearly half a mile wide. Her anchor light was burning brightly and was properly hung in the rigging as required by the International Rules. The pilot and lookout of the Oregon mistook this light for the Coffin Rock light, and did not discover the mistake until within 300 feet of the Clan Mackenzie when the helm of the Oregon was immediately put to port, but too late to avoid the collision. The light of the Clan Mackenzie should have been seen and distinguished for at least a quarter of a mile. There was a watch on board the Clan Mackenzie, who saw the light of the Oregon when she was about three-fourths of a mile away, and her hull when about one-fourth of a mile. The court below found that, when the watch perceived that the Oregon was heading directly for the Clan Mackenzie, he did not ring a bell or show a torch or a flash light. He simply shouted and continued shouting until just before the collision. The District Court held both vessels in fault, the Clan Mackenzie being in fault for the want of a proper lookout, for failure to ring her bell and

[2] Article 8: "Pilot vessels when engaged on their station on pilotage duty shall not show the lights required for other vessels, but shall carry a white light at the masthead, visible all around the horizon, and shall also exhibit a flare-up light or flare-up lights at short intervals, which shall never exceed fifteen minutes. * * *"

for the omission to exhibit a torch. The Supreme Court reversed the decree.

In the argument before the Supreme Court it was insisted that the Clan Mackenzie was bound to make use of every precaution which the exigencies of the case called for; that she had no right to rely upon her statutory light, but was bound either to exhibit a torch, ring a bell, or in some other equally efficient manner call the steamer's attention to the fact of her presence in the river, and stress was laid upon the article of the International Code which provided that nothing should exonerate a ship from the consequences of the neglect of any precaution which might be required by the special circumstances of the case. The Supreme Court, however, said that the lookout on the Clan Mackenzie was not called upon to act until it became manifest that the Oregon had not observed his light. He had a right to assume that she would not run directly down upon him but would see his light and give it a proper berth; that when it became manifest that his light had not been observed it was then too late to light a torch, if he had had one at hand, or perhaps even to ring a bell. The court added that—

"In view of the finding of the Circuit Court that, if a torch or flash light is not already prepared and at hand and ready for use, it would take five minutes to obtain one from the place where they are usually.kept and light it, we are unable to understand how the court could have held the Clan Mackenzie liable for the nonexhibition of a torch, unless upon the theory that it was her duty to keep one lighted all the time."

Also the court said:

"As we have already observed, it is not sufficient for the Oregon to cast a doubt upon the management of the Clan Mackenzie. In view of the clearness of her own fault, it is not unreasonable to require that she should make the fault of the other equally clear. This she has fallen far short of doing."

The foregoing case appears to dispose of the question as to the alleged negligence of Meeker in the instant case in not making use of a flare-up. He was not bound to do anything until it became manifest to him that he was about to be run down, and then he had no time to get it. The exigencies of the case did not admit of his doing anything except to shout, and that he did.

In The Furnessia, 154 Fed. 348, 83 C. C. A. 126, the mate of a sailing vessel, just prior to a collision in a fog, took the light from the binnacle and placed it on the top of the house, where it was mistaken by the steamer for the stern light of an overtaken vessel, in consequence of which the steamer ported when she should have starboarded. If she had starboarded, she would have passed in safety. Judge Lacombe, writing for this court, said:

"But, whatever lights were seen, the schooner obeyed the rules in maintaining her course and speed unchanged until the crash came."

And he also declared that—

"We are not inclined to hold the schooner in fault because the mate, terrified in the presence of impending peril, lost his head so completely as to do the one thing which made the threatened catastrophe certain."

In The Helen G. Moseley, 128 Fed. 402, 63 C. C. A. 144, there was a collision at sea on a clear night between a steamer and a schooner on crossing courses. The lights of the schooner were properly set and properly burning. The steamer contended, and three of her officers, as well as the lookout, that the schooner was on such a course that her lights could not be seen in time to have prevented the collision. They did not see her lights until immediately before the collision. The court, composed of Judges Wallace, Lacombe, and Coxe, held the steamer, as the burdened vessel, solely in fault. Those on the schooner saw the steamer, but thought she would change her course and keep clear, and the schooner held her course. The steamer, however, came on without apparent change, and collided with the schooner, which did nothing to avoid the collision. The necessity in such a case of a flare-up light is not referred to, although it is said that, if the steamer had been approaching the schooner abaft her beam, she would have been in fault for not exhibiting a flare-up light or a torch to a vessel so approaching.

In The Howard B. Peck (D. C.) 48 Fed. 334, there was a collision with a vessel at anchor in Hampton Roads on March 26, 1891. It was alleged as a fault that the anchored vessel was at fault, in that it did not display a torch, although her lights were properly set and burning. Article 12, in the exact language in which it now appears in the act of 1897, was in the act of 1890 then in force, and provided that every vessel might, if necessary to attract attention, show a flare-up light. The vessel at anchor could see the lights on board the approaching steamer, and the court held that therefore there was no reason why those in command should suppose that the lights of the anchored steamer were invisible to the approaching vessel, or that there was occasion for a torch. The vessel was held not in fault for not resorting to it. And in the case at bar Meeker, on the Drifter, had no difficulty in seeing the lights on the Lafayette, and he had a right to suppose that she saw his lights and there was no occasion for a torch.

The court below has stated in his opinion that the use of a flare in this case would have been positively unlawful. No reason for this opinion is given, and no authorities are cited. As this is not a case of an overtaken vessel, we suppose the statement was based upon the theory that a flare can be used on the stern of an overtaken vessel, but is not to be used elsewhere, and where the vessels are approaching each other with all lights burning. It has been held repeatedly that the showing of a flare-up light to a steamer approaching from forward of the beam is a fault. In The Algiers (D. C.) 38 Fed. 526, Judge Benedict stated the rule that it was a fault for a schooner to display a flare-up light to an approaching vessel, except when she was being overtaken by such vessel. The decision was under the statute of March 3, 1885. 23 Stat. p. 438. The same doctrine is asserted in Brigham v. Luckenbach (D. C.) 140 Fed. 322, 329. In the latter case the collision occurred in November, 1904, and therefore under the Act of March 3, 1897, 29 Stat. p. 690; but no notice of that fact was taken in the opinion, although the language of the two acts differs in important particulars. It was said in that case, that, as those on the schooner saw

the steamer approaching, they had a right to suppose that the steamer had the schooner in view, and that as she was approaching from forward of the beam it should have exhibited a flare-up light to the steamer. "But it is contended," said the court, "that when the steamer was very close to the schooner then, under article 12, the schooner should have shown a flare-up light to the steamer, to attract her attention. The tendency of the courts is to hold that the exhibition of irregular lights by a vessel to an approaching vessel is attended with great danger, as such action might tend to very greatly mislead." The court held that the schooner was not in fault in failing to show a flare-up light to the steamer at any time during her approach, or at the time when the vessels came together. In the view we take of the case it is not necessary to pass upon the question whether under the rules now existing the use of a flare would have been unlawful. It is enough in the present case to say that under the circumstances here existing the failure to use a flare, even if its use would have been lawful, was not in itself such an omission as should be attributed a fault leading to a division of the damages.

In The Robert Graham Dun and The Excelsior (D. C.) 102 Fed. 652, it was decided that a schooner is not to be held in fault for a collision with a steamer in the night because of her failure to exhibit a flare-up light, where her other lights were burning brightly. It was said:

"The conclusion that the schooner's light was neither dim nor obscured must be followed by a finding that it is not chargeable with fault for omission to exhibit the flare-up light. The rule permits the use of a flare-up light, but does not make it obligatory upon the schooner, unless perchance the circumstances were such that prudence would require it."

In The Gate City (C. C.) 90 Fed. 314, 320, there was a collision at night between a steamer and a sailing vessel. The steamer was where she was by her own gross fault. The sailing vessel was where she was of right. The lights of the sailing vessel were not seen; those of the steamer were. The steamer, sailing on a course a half point off the schooner's port bow, changed her course to one directly across the bows of the schooner, which kept its course. The fault of the steamer was obvious but it was claimed the schooner was also in fault, and that she should have shown a flash light. The court held otherwise, and said:

"She was carrying the lights required by law, and was not required to have a flash light in readiness, so that it could be sent off if a steamer chanced to run across her course, with scarcely more than a minute's and possibly a few seconds' warning."

Meeker kept his course and at no time changed it. In The Nacoochee, 137 U. S. 330, 340, 11 Sup. Ct. 122, 34 L. Ed. 687, it was claimed that a sailing vessel made no change in her helm up to the very moment of collision, and was in fault for not putting her helm hard aport when the steamer was seen to be within 40 or 50 feet of her, and that the collision might have been avoided if that course had been taken. The court answered it by saying that it was the primary duty of the schooner to keep her course, and that even if it was an error of judgment to hold her course it was not a fault, being an act resolved upon

in extremis, a compliance with the statute, and a maneuver produced by the fault of the steamer. The steamer was seen when 400 or 500 feet away.

[2] It is to be observed, in determining the question of whether or not there was mutual fault, that this case is one of collision between a steamer and a sailing vessel. In this class of cases the rule is that a strong case must be made out if the sailing vessel is to be held in fault. This rule was stated in Crockett v. Newton, 18 How. 581, 15 L. Ed. 492, where Mr. Justice Curtis said:

"It must be remembered that the general rule is, for a sailing vessel, meeting a steamer, to keep her course, while the steamer takes the necessary measures to avoid a collision. And though this rule should not be observed when the circumstances are such that it is apparent its observance must occasion a collision, while a departure from it will prevent one, yet it must be a strong case which puts the sailing vessel in the wrong for obeying the rule. The court must clearly see, not only that a deviation from the rule would have prevented collision, but that the commander of the sailing vessel was guilty of negligence or a culpable want of seamanship, in not perceiving the necessity for a departure from the rule, and acting accordingly."

[3] It is also to be observed that, if one vessel places another in a position of extreme danger by wrongful navigation, the other ship is not to be held to blame if she does something wrong and is not navigated with perfect skill and presence of mind. The Maggie J. Smith, 123 U. S. 349, 8 Sup. Ct. 159, 31 L. Ed. 175; The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122, 34 L. Ed. 687. In The Nichols, 7 Wall. 656, 666 (19 L. Ed. 157), the court declared that—

"Mistakes committed in such moments of peril and excitement, when produced by the mismanagement of those in charge of the other vessel, are not of a character to relieve the vessel causing the collision from the payment of full damages to the injured vessel."

And in The Carroll, 8 Wall. 302, 306 (19 L. Ed. 392), the court said:

"If there was fault on the part of the schooner, the steamer committed a far greater fault in suffering the vessels to get in such dangerous proximity at the moment preceding the collision, and as she has furnished no excuse for this misconduct, is chargeable with all damages resulting from this collision."

And if in the present case Meeker was guilty of a fault in not using a flare, when at the last he saw that a collision was imminent, his slight fault, due to the gross misconduct of the Lafayette, cannot be used as a justification for this court's relieving her from responding in full measure for all the damages she inflicted.

When a vessel is put in great peril without any fault of her own, the question of her negligence in a sudden emergency does not depend upon whether she did everything she might have done or pursued the best possible course. In such cases the rule is that a mistake made in the agony of almost certain collision is regarded as an error for which the vessel that caused the peril should alone be held responsible.

[4] If, however, we are in error, and Meeker be blameworthy the error cannot by any possibility prejudice the claimant in any of the cases now before the court, except that brought by him suing in his individual capacity. His negligence cannot be imputed to those who were by his invitation upon the yacht at the time. In the well-

known case of Thorogood v. Bryan, 8 C. B. 115, decided in 1849, a passenger in a public vehicle was held chargeable with any negligence of its managers which contributed to his injury, notwithstanding the fact that he had no control over the driver. That case has been overruled in England and rejected in the courts of this country. The theory that one who rides in a private conveyance thereby makes the driver his agent and is responsible for his negligence, even though without power to control him, is maintained in a few states. Lauson v. Town of Fond du Lac, 141 Wis. 57, 123 N. W. 629, 25 L. R. A. (N. S.) 40, 135 Am. St. Rep. 30; Kane v. Boston Elevated Ry. Co., 192 Mass. 386, 78 N. E. 485; Omaha, etc., R. Co. v. Talbot, 48 Neb. 627, 67 N. W. 599; Whittaker v. Helena, 14 Mont. 124, 35 Pac. 904, 43 Am. St. Rep. 621. In 1 Shearman & Redfield on Negligence (6th Ed., 1913) § 66a, the learned authors, speaking of this doctrine, say:

"The notion that one is the 'agent' of another, who has not the smallest right to control or even advise him, is difficult to support by any sensible argument. The theory is universally rejected, except in three states mentioned, and it must be soon abandoned even there."

The doctrine of Thorogood v. Bryan was not followed by the English High Court of Admiralty. In The Milan, Dr. Lushington, of the Admiralty Court, in speaking of that case, said:

"With due respect to the judges who decided that case, I do not consider that it is necessary for me to dissect the judgment; but I decline to be bound by it, because it is a single case, because I know, upon inquiry, that it has been doubted by high authority, because it appears to me not reconcilable with other principles laid down at common law, and, lastly, because it is directly against Hay v. La Neve and the ordinary practice of the court of admiralty." Lush. 388, 403.

The Supreme Court in Little v. Hackett, 116 U. S. 366, 375, 6 Sup. Ct. 391, 29 L. Ed. 652, declared that Thorogood v. Bryan rested upon indefensible ground and disapproved and rejected it. The doctrine of imputed negligence, by which a person in one ship, though not identified with its management or navigation, can be chargeable with the negligence of that ship, and deprived of any right to proceed against the other negligent vessel, is too unreasonable to command respect. Indeed, it is laid down as the law now stands that a person injured on a vessel in collision can proceed against either or both, if both are negligent. Hughes on Admiralty, p. 192.

[5] It appears that Henry Haas commenced his suit on September 18, 1917, and while the suit was pending, on September 4, 1918, he died. Charles Haas was appointed executor of his estate. On the facts being made to appear by his affidavit, the court entered an order upon his request, on January 31, 1919, substituting the executor as libelant in the suit for the purpose of further prosecuting the action.

It also appears that Mary Agnes Meeker commenced her suit in like manner on September 18, 1917. Her death occurred on October 24, 1918, and Augustus S. Meeker was appointed administrator of her estate. On February 17, 1919, the court entered an order substituting him as libelant in her place and stead in the suit which she had commenced.

It is a long-established principle of the common law that a personal action dies with the person; and if a personal action was commenced, and before judgment the death of either the plaintiff or the defendant occurred, the action abated; but if death occurred after judgment, and during an appeal or writ of error, the suit did not abate. Roberts v. Criss (C. C. A.) 266 Fed. 296; 1 C. J. 169. The principle, however, that death before judgment abates an action for personal injuries, has no application to the facts of this case, which is not a proceeding in personam, but one in rem.

In cases of a maritime tort, the law gives to the party wronged a right to look to the ship for his remedy. A ship has no fixed abode, but is a wanderer, and visits places where her owners are not known, or, if known, are not accessible. The master is usually a person of insufficient financial responsibility to meet all the money demands which may arise out of the voyage. Hence the necessity of treating the ship as security for the demands which the voyage occasions. In such cases the law gives the lien, and vests in the creditor a special property in the ship at the time the debt or claim comes into existence; and it is held accordingly that a suit in rem against a vessel for personal injuries sustained in a collision does not abate by the death of the libelant. The Ticeline (D. C.) 208 Fed. 670; Id., 221 Fed. 409, 137 C. C. A. 207. In accordance with that principle, the substitution of parties, which the court below permitted to be made, was in accordance with the law.

[6] Our attention has been called to a number of New York decisions that a claim for personal injuries does not survive the death of the injured party; and we are also informed that in pursuance of the New York statutes causes of action for personal injuries abate upon the death of the parties. But what has been already said must have made it clear that these actions, arising out of a maritime tort and giving rise to a maritime lien, are not subject to the rules of the common-law courts or to the statutes of the state of New York. We are dealing with a maritime tort, and the rights of the parties are to be determined upon the principles of the maritime law. The lien which is claimed is not one created by any state. The damages which are sought are not damages for causing death.

The decree is affirmed in all five cases.