### LEVER TRANSP. CO. v. UNITED STATES.

### UNITED STATES v. LEVER TRANSP. CO.

### THE SILVER STATE.

(District Court, D. Massachusetts. April 18, 1923.)

Nos. 2035, 2075.

Collision ☞45—Steamer held at fault in colliding with schooner at night.
    Where sailing vessel carrying proper lights was run down by steamer at night, their courses being at right angles, the steamer *held* solely at fault.

In Admiralty. Libel by the Lever Transportation Company against the United States, the owner of the steamship Silver State, with cross-libel by the United States. Decree for libelant, and dismissing cross-libel.

Harrington, Bigham & Englar, of New York City, and Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for libelant.
    Charles P. Curtis, Jr., of Boston, Mass., Asst. U. S. Atty.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

PETERS, District Judge. These are cross-libels growing out of a collision between the schooner Elisabeth Ruth and the steamer Silver State, which occurred shortly after midnight on the morning of June 8, 1921, in the straits of Florida, about 70 miles northeast of Havana.

The schooner, a four-masted sailing vessel, of about 800 tons, 180 feet long, and 34 feet beam, was proceeding close-hauled on the starboard tack at a speed of 4 or 5 knots an hour. The wind was fresh, the sea choppy, the night dark, with conditions favorable to seeing lights on the water.

The schooner maintained her course and speed without changing from the time she first sighted the steamer until they came together, about half an hour.

The steamer, a Shipping Board vessel, combination passenger and freight, about 21,000 tons, 535 feet long and 72 feet beam, was proceeding at standard speed of about 15 knots, in a course approximately at right angles to the course of the schooner, from such a position as would bring them nearly, if not quite, together, without change of course or speed.

The steamer approached the schooner without seeing her for some 20 minutes after the schooner had made out the steamer's lights, which were the regulation lights, and, in addition, the illumination around the promenade deck.

Presently a cadet on the port wing of the bridge of the steamer reported a light a few points on the port bow, and a mate on the bridge in charge of navigation at the time ordered the wheel half-way to port and swung the bow of his ship 30° to starboard and the helm steadied. In a few minutes, nothing further being observed on the water, she was swung back on her original course. The people on the schooner, meanwhile, seeing the lights of the steamer rapidly approaching and noticing her changes of course, became apprehensive, threw flash lights or flares on the sails to illuminate them, blew a horn, held the vessel in as good control as possible, not too near the wind, and the captain called all hands.

The schooner was now made out by the steamer, and her engines (turbines) ordered reversed, but before she was appreciably checked in speed, full speed ahead was ordered, with the helm hard aport. She tried to sheer off by the bow of the sailing vessel. They were too near together, however, to accomplish this, and the steamer caught the schooner's jib boom, ripping it off, and scraped along the bowsprit with her port side and did some other damage. A slight leak developed, but the captain of the schooner refused assistance offered by the steamer and reached Havana the next day, where repairs were made.

I can attach no blame to the schooner for not changing her course. It was the duty of the steamer to avoid her and of the schooner to maintain her course, unless it became apparent that this was courting disaster. With the steamer coming rapidly, changing her course back and forth ("zigzag," as the captain of the schooner described it), he could not prudently do anything but hold his course, keeping his ship in control. Looking back upon the events of the disaster, it is not seen how the captain could have wisely handled his ship differently. In

fact, it is quite possible, as claimed by the lookout on the schooner, that, if the steamer had not changed her course the last time, she would have cleared the stern of the schooner.

It is urged in behalf of the steamer that the handling of the schooner was at fault and that she did not display proper lights. The first objection has been disposed of. It has no foundation. The case really turns on the question of lights on the schooner.

If the testimony of the officers and crew of the schooner is to be believed, she was carrying regulation running lights, burning brightly, properly placed, supplemented by flares or flash lights from the deck at frequent intervals, and she is not to be charged with any fault in respect to lights.

I have read the voluminous testimony, in deposition form, in behalf of the steamer, which, taken as true and "boiled down," amounts to this: That the men on lookout on the steamer did not see running lights on the schooner. It is positive against negative testimony.

It was testified in behalf of the schooner that lights of three different steamers were seen on the starboard bow as early as a quarter to 12 of the night in question. The captain went to bed, leaving orders to be called if the lights came closer. He made her out to be 3 or 4 miles off on his starboard bow. The mate went forward twice at the captain's direction to see that the side lights were burning, and finally the captain went forward himself to make sure. The testimony of all was that they were burning brightly. The schooner was painted white, loaded with lumber. All lower sails were on. All the men testified to the same effect. The engineer in charge of hoisting engine testified that he cleaned and filled the lights the day before, and put them up lighted before nightfall, and that they were good standard lights.

It is reasonable to assume that men in a situation the danger of which is apparent will take such obvious precautions for their safety as may be at hand, or that at least one man out of eight or nine would do so.

I should be strongly inclined to believe the testimony of the schooner's crew, even if contradicted, where their alleged actions are in harmony with taking what might be an avenue of escape from death. But I do not regard the testimony as really contradicted. The people on the steamer say they saw no side lights, red or green, in position on the schooner. These people were: The lookout, 21 years old, shortly before called from sleep, whose memory or observation was so poor that he insisted that the schooner was three-masted, although he saw her afterward at Havana in the daytime, and who said he saw red and green lights on the schooner before the collision, but thought they were moving, being carried along the deck. He said he was excited and could not remember much; did not notice the undisputed fact that the bow of the steamer swung back to port after going to starboard the first time. The quartermaster, stationed on the starboard wing of the bridge, whose attention was first called to the matter by a commotion in the wheelhouse, said he looked over the rail of the steamer and saw the sails of the schooner. He kept his station and was ordered to go below and arouse the captain. The cadet, or student, on the port wing, whose station, next to that of the lookout at the

bow, was best adapted for observing the lights of the schooner in this case, and who did notice the first light and reported it. An inexperienced man, scanning the sea with his glasses, might easily overlook the lights of a low-lying vessel, especially if the water was rough.

The other quartermaster was in the wheelhouse at the wheel, and the mate at or near the door of the wheelhouse.

A passenger testified that he was sleeping on the upper deck of the steamer, and was aroused by the ringing of the engine telegraph, and looked out on the water and saw the schooner plainly visible in the lights of the steamer. Almost simultaneously the collision occurred. He said, as the schooner went under the steamer's stern, that he saw a light, looking like a faint red light. He saw lights on the sails of the schooner and thought it was the reflection from the lights of the steamer.

The log of the steamer makes no mention of the alleged fact that there were no lights on the schooner. After the collision, when the steamer spoke the schooner, there is no testimony that any complaint was made to the captain of the schooner that he had not been carrying the proper lights.

It was the schooner's duty to hold her course, and the steamer's to keep out of her way. The fact that the sailing vessel, carrying proper lights, was run down by the steamer on a night when the visibility as to lights was good, throws a heavy burden of explanation upon the steamer. The fact that the steamer failed to keep out of the way of the schooner raises a presumption of fault on her part, which the evidence in this case fails to overcome.

For quite smiliar cases, see The Lafayette (C. C. A.) 269 Fed. 917; Crowell et al. v. United States (D. C.) 273 Fed. 227; The Chepstow Castle (D. C.) 253 Fed. 147; The Stifinder (C. C. A.) 275 Fed. 271.

There must be a decree in the first case, adjudging the Silver State to be solely at fault for the collision, and referring the case to an assessor to state the damages, and in the cross-libel a decree dismissing the libel.