## CROWELL et al. v. UNITED STATES.

(District Court of Massachusetts. April 4, 1921.)

No. 1860.

1. **Collision** &8592;79—**Evidence held to show lights of libelant's schooner were properly set and burning.**

    The evidence in libel for collision of steamer with libelant's schooner *held* to show schooner's lights were properly set and burning at time of collision.

2. **Collision** &8592;75—**Steamer held solely in fault for collision with sailing vessel.**

    Steamer *held* solely in fault for collision with schooner, the steamer approaching at full speed, while the color and significance of the schooner's lights were yet uncertain, and giving an order to port when the light was first seen, instead of starboard, or hard astarboard, which would at that time have cleared the schooner.

3. **Collision** &8592;49—**Steamer's failure to clear schooner raises presumption of fault.**

    It being a schooner's duty to hold her course, and a steamer's duty to keep out of her way, the fact that the steamer failed to do so raised a presumption of fault on her part.

In Admiralty. Libel in personam by Peter H. Crowell against the United States for collision with libelant's vessel by the steamer Laramie, owned by the United States Shipping Board. Decree finding the Laramie solely in fault, and referring the case to an assessor to state damages.

E. E. Blodgett and Blodgett, Jones, Burnham & Bingham, all of Boston, Mass., for libelants.

The United States Attorney.

MORTON, District Judge. This is a case of collision between the schooner Florence Thurlow and the steam tanker Laramie, owned by the United States Shipping Board. At the time in question the Laramie was proceeding, under ballast, from New York to Tampico, Mexico, where she was to load oil under a charter party with the Barber Asphalt Paving Company. The United States filed a suggestion of want of jurisdiction, and exceptions to the libel on the ground that the Laramie was not a merchant vessel, within the purview of the Act of March 9, 1920, c. 95 (41 Stat. 525), which are overruled. The United States thereafter answered, and the cause proceeded as a libel in personam against the United States.

The collision occurred on May 12, 1920, about 9 miles southeast of Sea Girt light on the New Jersey coast, at about 9:20 p. m. The Laramie was running almost due south; the Florence Thurlow about north. The schooner was a four-masted vessel. She had all lower sails set; her booms being well off on the starboard side. She had come from Jamaica, and carried a cargo of logwood, part of which was on deck. The night was clear and dark; the wind, south-southwest and light. There was a shower just after the collision, while the schooner's crew

were in the boats; but it does not seem to have been raining immediately before the accident. The starboard bow of the steamer struck the starboard quarter of the schooner, inflicting such severe injuries that the schooner sank within a few minutes. All her company were safely transferred to the steamer.

[1] According to the schooner's witnesses, her lookout first sighted and reported the steamer when the latter was 4 or 5 miles distant. Both range lights of the steamer were then in line, and it was evident that she was headed at or close to the schooner. From that time, according to the men on the schooner's deck, they kept the steamer under continuous observation. The lookout testified that he inspected the schooner's starboard light and saw that it was burning brightly. The mate also says that he looked at it and that. it was burning brightly. According to them, as the steamer approached she swung to her starboard, showing only her red light, but very soon swung back and showed both lights. At that time she was so close to them and so headed that the likelihood of a collision was apparent. As she came still nearer she shut out her red light, went by the fore part of the schooner, and struck on the quarter. Just before the contact the schooner's helm was put to starboard, the effect of which was to turn her bow away from the steamer and to throw her stern slightly towards the steamer. It was a movement so obviously made in extremis and in a great emergency that there is no need to speculate as to whether it was wise or unwise. Probably it did not affect the result, because it is not likely that the schooner's stern was thrown by the movement of her helm into the path of the steamer, when otherwise the vessels would have gone clear. Just before the contact, the schooner's lookout called her crew. Her engineer testifies that he promptly turned out, saw that the steamer was on top of them and was not going to hit the fore part of the schooner, and that he jumped on the starboard rail, looked at the schooner's side light, and saw that it was burning brightly. She was equipped with Davis lights, which are, upon the testimony before me, the best thing that is known in oil side lights. One in good condition, properly trimmed, should have been visible on the night in question for a distance of 3½ or 4 miles.

Taking the evidence of the schooner alone, it shows that she was free from fault, and that the accident was due to improper navigation of the steamer.

The description of the accident as given by the steamer's witnesses does not differ greatly from that given by the schooner's, except as to the starboard light of the schooner. The steamer was in charge of her third mate, but apparently her captain felt some responsibility for the watch; she had a lookout on her foredeck and a man at the wheel. Her log shows that Sea Girt light was abeam at 9 p. m. As she approached it a four-point bearing was taken, to determine the distance of the steamer from the shore. The captain and the third mate were both engaged in that work.

The first that was seen of the schooner from the steamer was when the lookout discovered what appeared to him to be a dim white light

slightly on her port bow. He says that it appeared close at hand, and he ran back a few steps and reported it as dead ahead to the mate, who was on the bridge. The captain was at that time below. The mate testifies that he himself observed the light at the same time as it was reported. The lookout says that he immediately went back to his station, and that by the time he had reached it he was able to make out the sails of the schooner, and also noticed that the light had a greenish hue. It was then so near that a collision appeared inevitable. The captain of the steamer came hurriedly to the bridge, and he and the helmsman testify that they observed the light, and that it was dim and greenish, having the appearance of a smoky white light. When the steamer went by it, however, all the men on her deck who testified to the point said that it was in her forerigging and was her starboard side light. There is no definite testimony that any other light from the schooner except her side light was seen on the steamer. The steamer's witnesses testify that the light was very dim and smoky.

When the light was first observed and reported on the steamer, the mate ordered her helm to port—i. e., he swung her to the right across the schooner's bow; but the steamer never seems to have been so far to port of the schooner as to open the latter's red light. When the color of the light and the sails had become apparent, he directed the steamer's helm to be put hard astarboard, swinging her away from the schooner. He says that the two orders followed each other very closely, only a few seconds between. Her helmsman, however, testifies that there was perhaps a minute between the order to port and the counter orders to starboard and hard astarboard, which came practically together. As the steamer was making nearly 1,000 feet a minute, the difference in time becomes material. The testimony of the helmsman agrees with the testimony given by the schooner's witnesses, viz. that they saw the steamer swing to her starboard, and later, when she was close at hand, swing back. On the steamer's testimony, she did not turn to starboard until after she had discovered the schooner's light; and, of course, being a large vessel, she did not begin to swing the very instant that her helm was ordered to port. An appreciable time must have elapsed after the order before the effect could be noticed from another vessel. Even on the steamer's testimony, it appears probable that the schooner's light was first seen when far enough distant for the steamer to have avoided accident, if she had promptly recognized the color of it, or had stopped her engines and proceeded cautiously until its character could be made out.

The only excuse advanced by the steamer for her failure to keep out of the way of the schooner is that the latter was not showing a proper light; and there is no doubt a good deal of evidence on the part of the steamer that the light was dim and smoky. But I am inclined to give more credence to the schooner's crew than to the steamer's in regard to that matter. They had the steamer under observation longer than the steamer seems to have had them, and would naturally in the meantime pay particular attention to their own lights. The Alice v. Phillips, 81 Fed. 415, 26 C. C. A. 467; The Richmond (D. C.) 114 Fed. 208,

211. They insist that their starboard light was burning brightly. The fact that the men on the schooner described correctly the changes of course made by the steamer shows that they were watching her, as they testified. The lookout on the steamer was a boy of 19, who, according to his deposition, had had a very limited experience at sea and as a lookout; the officers of the steamer, in addition to their duties, had been engaged in taking the bearing of the lighthouse; her mate, who testified that he was on the bridge, well may have had his attention more immediately devoted to other matters than to the sea ahead. Observations of the schooner's light made from the steamer as she slid past it just before the crash by witnesses not disinterested, whose attention must have been distracted by the impending collision seems to me insufficient to outweigh the direct and positive testimony of the schooner's crew. On all the evidence I find that the schooner's lights were properly set and burning.

[2, 3] The immediate cause of the collision appears to have been an error in the navigation of the steamer. If, instead of the order to port, given by the steamer's mate when the light was first seen, the order had been starboard or hard astarboard, as it was later, or if her engines had been slowed or stopped until the character of the light ahead was made out, she would have cleared the schooner without difficulty. I am disposed to hold with some strictness that it is a fault for a vessel to approach closely at full speed a light the color and significance of which is not clear (The Richmond, supra [D. C.] 114 Fed. at page 213; The Alaska [D. C.] 22 Fed. 548, 553) ; and I find that the steamer was at fault for doing so in this instance. It is possible that the mate of the steamer at first intended to cross the bow of the other vessel, and, when they got near together, found he had misjudged the schooner's distance or speed and would be unable to do so, and that he thereupon made an unsuccessful effort to pass under her stern. It was the schooner's duty to hold her course, and the steamer's to keep out of her way. The fact that the steamer failed to do so raises a presumption of fault on her part which the evidence fails to overcome. The Colorado, 91 U. S. 692, 693, 23 L. Ed. 379; The Richmond (D. C.) 114 Fed. 208.

On all the evidence, I find and rule that the collision was caused solely by the fault of the Laramie. See Brigham v. Luckenbach (D. C.) 140 Fed. 322; The Noreuga (D. C.) 211 Fed. 355.

Decree that the Laramie was solely at fault, and refer the case to an assessor to state the damages.