**NEW ENGLAND MARITIME CO. v. UNITED STATES, and six other cases.**

Nos. 218, 205, 243, 244, 247, 266, 333.

District Court, D. Massachusetts.

Jan. 14, 1932.

In case No. 218:

Foye M. Murphy and Blodgett, Jones, Burnham & Bingham, all of Boston, Mass., for libelant.

Frederick H. Tarr, U. S. Atty., and A. Chesley York, Asst. U. S. Atty., both of Boston, Mass.

In case No. 205:

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for libelant.

Frederick H. Tarr, U. S. Atty., and A. Chesley York, Asst. U. S. Atty., both of Boston, Mass.

Foye M. Murphy, of Boston, Mass., for Richard K. Gould, trustee in bankruptcy of New England Maritime Co.

In cases No. 243 and 244:

A. Chesley York, Asst. U. S. Atty., of Boston, Mass.

Foye M. Murphy and Blodgett, Jones, Burnham & Bingham, all of Boston, Mass., for respondent.

In cases No. 247 and 266:

Wm. B. Sullivan, Jr., and John V. Spalding, both of Boston, Mass., for libelant.

Blodgett, Jones, Burnham & Bingham and Foye M. Murphy, all of Boston, Mass., for New England Maritime Co.

Frederick H. Tarr, U. S. Atty., and A. Chesley York, Asst. U. S. Atty., both of Boston, Mass.

In case No. 333:

Frederick H. Tarr, U. S. Atty., and A. Chesley York, Asst. U. S. Atty., both of Boston, Mass.

HALE, District Judge.

These cases arise from a collision on April 4, 1929, off the North Carolina coast, between the libelant's schooner, A. Ernest Mills and the United States destroyer Childs. The original libel was filed by the New England Maritime Company, owner of the schooner, in behalf of itself and as bailee of the cargo of salt on board, against the United States of America, under the so-called Public Vessels Act, namely, the Act of Congress ap-proved March 3, 1925 (46 USCA §§ 781–790), entitled an act authorizing suits against the United States, in admiralty, for damage caused by, and salvage service rendered to, public vessels belonging to the United States. The libel was later amended to include the claims of the officers and crew of the schooner, for loss of personal effects, and still later amended to substitute, as party libelant, Richard K. Gould, trustee in bankruptcy of the New England Maritime Company, and specially naming the cargo owners as colibelants. The libel, under the Public Vessels Act, also covered any faults of the destroyer Coghlan, and of those on board. To this libel a cross-libel was filed by the United States of America, seeking to recover damages to and detention of the destroyer Childs. A second libel was filed by the New England Maritime Company, for itself and as bailee of the cargo, against the United States of America, under the Public Vessels Act, covering any faults of those on the destroyer Childs. This libel was amended to correspond with the first libel. To this second libel the United States of America filed a cross-libel, seeking to recover for damages to and detention of the destroyer Childs. There then followed libels by Eliza Pogson, Administratrix, Eleanor M. Chaney, Administratrix, and Floyd W. Turner, Administrator, against the United States of America, seeking to recover for the deaths of Captain Chaney and the two other members of the schooner's crew who were drowned. In each of these three libels last named the New England Maritime Company was impleaded as a party respondent under the 56th Admiralty Rule (28 USCA § 723).

All these suits arise out of the same facts, and by order of the court are consolidated for trial.

The A. Ernest Mills was a four-masted schooner of 946 gross and 841 net tonnage, 190%0 feet in length and 37%0 beam. She was on a voyage from Turks Island, W. I., to Norfolk, Va., with a cargo of salt, and was commanded by Arthur C. Chaney, master. George A. Carver was first mate; and there was a crew of seven colored men.

The collision occurred at 9 o'clock in the evening, April 4, 1929. The schooner alleges that there was a haze with fair visibility, the least visibility that existed during the night; that the schooner had an able seaman stationed on the forecastle head, another able seaman at the wheel, a master on the quarter deck, and a first mate and second mate, the latter an able seaman, near the mizzen rig-

ging; that she carried a green and red running light and a white stern light, all lighted by electricity; that there is no claim that her sails, as they were trimmed, could obscure her running light. While proceeding off Currituck Light, N. C., a little after half past 8 in the evening of April 4, 1929, the navigators of the Mills saw in the distance the yardarm blinker lights of several vessels which they thought to be United States naval vessels, and which later proved to be the destroyers Coghlan, Childs, and Bruce. The libelant alleges that the senses of all on board the Mills were aroused to the danger confronting the schooner, although the fact that no running lights or even a masthead light was yet visible indicated that the war vessels were a considerable distance away, estimated by witnesses on the schooner to be about eight or ten miles distant; that at this time, about fifteen to twenty minutes before the collision, the first mate, Carver, under orders of Captain Chaney, changed the 15-watt bulbs of the running lights to 25-watt bulbs; and that precautions were taken to see that both the red and the green lights were burning brightly.

It appears from the proofs, as stated by the government, that the three destroyers, Coghlan, Childs and Bruce, on April 4, 1929, were bound for Guantanamo, Cuba, to join the fleet for naval maneuvers. As sister ships of the same general design, the destroyers were about 300 feet long, 30 feet beam, and drawing mean 12 feet 2 inches. They were proceeding in formation, with the Coghlan leading, the Childs about 30 degrees on her starboard quarter, distant 1,200 to 1,500 yards, and the Bruce in the same position on her port quarter, with a distance of about 1,200 yards between the Bruce and the Childs. Their speed was 18 knots and their course 160 true, after 7 o'clock. Each was equipped with a gyro-compass reading the true course. Each carried two range lights on the foremast and mainmast and red and green side lights. Each of these lights was a powerful light. The deck watch of each of the destroyers as they approached the schooner was: On the Coghlan, Commander Moran, senior officer of the squadron and in command, who graduated from the Naval Academy 1910, with eighteen years' sea experience on battleships, gunboats, and destroyers, and six years in command of destroyers; Lieutenant Griffin, who graduated from the Naval Academy in 1927, and on the Coghlan since May, 1928, with the assignment of deck watch officer for the eight

months prior to the collision; Lieutenant Sedgewick, navigating officer, who had been going to sea continuously as officer of the deck on naval vessels of all kinds since 1918, save for shore duty 1925–26; starboard lookout, Whelan, age 22, who had been with the destroyer for a year and two months, acting as lookout about eleven months before the collision; port lookout, Coombs, age 23, who had been on the Coghlan for about a year and had stood watch for over eleven months, having the rating of a seaman, second class; Steersman Breen, Signalman Johnson, and Messenger Warrick. The deck watch of the Childs was as follows: Officer of the deck, Lieutenant Johnston, graduated from the Naval Academy June 3, 1926, joined the United States steamship Arkansas as junior watch and division officer September 1926, to July, 1927; communication watch officer, steamship Arkansas March 5, 1928, and joined the Childs March 5, 1928; previous to the collision he had served as officer of the deck thirteen months. Majors, starboard lookout, age 26, seaman second class; had stood watches aboard the Childs over three hundred periods from the time he joined the Childs in April, 1928. Strong, port lookout, seaman first class, with navy since 1925, upon sea duty. Zak, signalman, age 25, attached to the Childs for five years. Anderson, wheelsman or quartermaster, who had been by the Childs for two years, four months, during which time he had been acting as wheelsman for sixteen to eighteen months.

It appears that the three destroyers were navigated and operated solely from the bridge. The place of the collision was in the usual line of traffic of all vessels bound north and south of Hatteras. While proceeding at the speed of 18 knots, it appears from the proofs offered by those on the Coghlan that a white light was seen in the path of the apex destroyer Coghlan, which proved to be a light on the schooner Mills bound on a course about opposite that of the Coghlan; and in about six minutes from the time this white light was first sighted by those on the Coghlan the green light and the loom of the sails of the Mills were seen by Commander Moran and the officer of the deck in sufficient time for the Coghlan to be put under hard left rudder and leave the schooner Mills about 200 yards on the starboard side. The Coghlan immediately signaled by blinker to the Childs, "Sailing vessel close aboard." The Coghlan then at once put a spotlight on the sails of the Schooner.

The Childs acknowledged receipt of the signal, but kept on at 18 knots, neither stopping nor slowing. The Childs appears to have made no attempt to keep clear of the schooner until she was upon her. Then, seeing the schooner approximately dead ahead, the Childs executed hard right in an attempt to cross the bow of the schooner, and also gave the order to reverse her engines. The bow of the Childs struck the schooner between the main and mizzen rigging, cutting through the vessel and cargo, beyond her keel, and causing her to sink in about three minutes, carrying down with her the master, the cook, and one seaman.

The government urges that the navigating officer and the officer of the deck on the Coghlan were using powerful marine glasses when they first observed the dim white light dead ahead; that three officers testified that the light seemed to them to have no characteristics except a dim white light dead ahead which, under article 1 of the International Rules, would indicate a vessel proceeding in the same direction and some distance off; that the officer of the deck, exercising great care and with powerful glasses, kept the dim white light in sight, and that he next saw the loom of the sails of the schooner about 200 yards off, and shortly afterwards picked up a dim green light; that he recognized then that the white light proceeded from what he says looked to him like a lantern on deck; that the port lookout on the Coghlan first observed a dim white light on the schooner when she passed close aboard about 100 to 200 yards distant; that he recognized the loom of the schooner and never saw a green light upon her at any time; that the starboard lookout also saw the form of the schooner, observed only a white light, and says he did not see a green light; that, though Commander Moran and Officer Griffin saw the green light and the sails of the schooner in sufficient time to left rudder and leave the schooner about 200 yards to starboard, the light appeared to the commander to be dim.

The officers of the three destroyers are well described as "highly trained" and as of the "finest type of navigators." They are men of distinguished personal appearance. With great force their learned proctor has described their appearance and their conduct in places of difficulty and danger. But I cannot sustain the government's contention in their defense. They were under Naval Regulations and under instructions which plainly indicated that they were bound by the International Rules. See title 33, USCA,

§ 61 et seq. In Ocean S. S. Co. v. U. S., 38 F.(2d) pages 782, 786, in speaking for the Circuit Court of Appeals for the Second Circuit, Judge Learned Hand said: "The International Rules * * * apply to 'all public and private vessels of the United States.' * * * If unfortunately it is impossible to equip submarines properly, they must take their chances until some provision has been made for them by law. We have no power to dispense with the statute, nor indeed has the Navy. As they now sail they are unfortunately a menace to other shipping and to their own crews, as this unhappy collision so tragically illustrates. We cannot say that they are not to be judged by the same standard as private persons. The safety of navigation depends upon uniformity; only so can reliance be placed upon what masters see at night."

In the case before me these officers were sailing the three destroyers in the nighttime, along the path of commerce, in a triangular formation, making a sweep of about a half mile in width, and at a speed of 18 knots. While so proceeding, they were taking upon themselves a great burden of responsibility. These highly trained navigators must have realized that, unless they observed very strict care they might become a menace to other ships, as certain submarines were held to be by Judge Hand. While proceeding as described, the officer of the deck of the Coghlan observed a white light ahead, some distance off, which was thought to be a vessel sailing in the same direction; but the Coghlan kept on, and the squadron kept on, at the same speed and on the same course. The officer next saw the loom of the schooner's sails about 200 yards off, and shortly afterwards picked up what he described as a dim green light. He then saw what "looked like a lantern" on the deck of the schooner Mills; and there is further testimony that a lantern was seen. Whether it was in fact a lantern does not clearly appear; and the proofs on the part of the schooner are to the effect that, when the naval vessels were seen to approach, Captain Chaney became nervous and procured a flash-light which threw a white light on the lee side of the spanker, to attract the attention of the approaching ships (as was done in the case of The Prinz Oskar [C. C. A.] 219 F. 483, 487); that Captain Chaney held the light in his hand on the starboard side at the after house in the place where the men on the destroyer say they saw it. After seeing the white light, according to their own testimony, the destroyers continued their approach. The Coghlan leading

678

came close to the schooner, saw her green light and swerved to her left, green to green, clearing the schooner, as those for the schooner say, by about 600 feet. At the same time the Coghlan threw a spotlight on the schooner and sent a special message to the Childs, "Sailing vessel close aboard." The signalman of the Childs received the message, shouted it out word for word to the bridge, and acknowledged it to the Coghlan; but the Childs made no change in her course or speed. Johnston, the young officer on the Childs, testifies that when he heard the message from the Coghlan, "Sailing Vessel Close Aboard," he realized that the danger was especially to the Childs, rather than to the Bruce, and that he knew she was going either in the same direction or an opposite direction from the Childs, and with that understanding he gave the order "hard right" and slowed down. It appears then that instead of turning to the left, as the Coghlan did, he ordered "hard right" and turned across the schooner's bow and at the same time gave the bells to stop and reverse. There is testimony that the men on the Childs did not see the spotlight of the Coghlan. This light was seen by the Bruce. It is contended that the light was not visible on the sails of the schooner because it was shot on the windward side of the spanker; but I think it must have been visible to a vigilant lookout upon the Childs. I think the Childs was clearly in fault for not keeping clear of the schooner. When the light was first seen ahead by the Coghlan, I think, in the exercise of good seamanship, the Coghlan should have slackened her speed and have caused the speed of the squadron to be slackened, even though the light appeared to be from a vessel going in the same direction. It was in the nighttime, upon an ocean highway. The squadron and the schooner were approaching at the rate of a mile in about two and four-tenths minutes, occupying a great space in the path of commerce. From that minute, every one of the few passing minutes was adding to the danger of her approach. After the Coghlan had passed to the left of the schooner and had sent the special signal to the Childs, "Sailing Vessel Close Aboard," the Childs was clearly at fault in that she did not slacken speed. If she had done so, I think the tragedy would have been averted. Speed was a very vital element. Commander Moran testifies that he thinks, if the Childs had been about five seconds slower there would not have been any collision, although in his opinion the schooner should have changed her course. I think, then, that the Childs

was plainly at fault for not keeping clear of the Mills, either by slowing down from 18 knots' speed before coming up with the Mills or by not stopping or turning to her left after receiving the Coghlan's signal. I think in not reversing her engines earlier, and in her attempt to cross the bow of the Mills, as she did, she was in violation of the International Rules, articles 22 and 23.

In The New York, 175 U. S. 187, 206, 20 S. Ct. 67, 74, 44 L. Ed. 126, in speaking for the Supreme Court, Mr. Justice Brown said: "There is another rule pertinent in this connection, namely, rule 21 * * * that every vessel when approaching another vessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse. * * * The lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn, but the failure to do so has been the cause of the condemnation of so many vessels that it would seem that these repeated admonitions must ultimately have some effect."

In The City of New York, 147 U. S. 72, 85, 13 S. Ct. 211, 216, 37 L. Ed. 84, Mr. Justice Brown, in speaking for the Circuit Court, said: "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor."

It is charged by the libelant that the destroyer Childs was at fault for not maintaining a proper lookout. In The Orion, 26 F.(2d) 603, 605, the Circuit Court of Appeals for this Circuit said: "It is a primary rule of navigation that all moving vessels shall maintain a careful and efficient lookout. The lookout is 'both eyes and ears of the ship'; he must be properly stationed on the forward part of the vessel and must be held to a high degree of vigilance in that position." Brigham v. Luckenbach (D. C.) 140 F. 322; The Ottawa, 3 Wall. 268, 18 L. Ed. 165; St. John v. Paine, 10 How. 557, 13 L. Ed. 537. The Lake Monroe (D. C.) 270 F. 858. The government contends that the Childs was not at fault in respect to the lookouts; that she had complied with the law, in that she had lookouts properly stationed in the forward part of the ship; that the large experience of highly trained men on destroy-

ers ought to serve as a guide both as to the number of lookouts and the positions to be stationed; that the result of years of experience has led to the adoption of regulated watches, and that it has been found that two lookouts, one stationed on each wing of the bridge, were essential; that, if it were an absolute condition that lookouts must be carried on the bow, it would be a matter of the rules of the road; and that the stationing of lookouts is not specifically provided for in those rules.

It appears from the proofs that each destroyer carried as a watch on the bridge a commanding officer, an officer of the deck, a navigating officer, a wheelsman, a signalman, and two lookouts. These men were stationed upon the bridge, which was in each instance a triangular space 20 by 24, with its apex pointing towards the bow. In addition to the men on the bridge there were also on the bridge a gyro-compass, standard compass, port pelorus, starboard pelorus, starboard depth charge release gear, port depth charge release gear, starboard torpedo director stand, port torpedo director stand, speed light indicator stand, speed light control stand, sounding machine, chart room and emergency cabin, the wheel, enunciator, and voice tubes. The windows on the bridge were of triplex glass, which by reason of the inner layer of celluloid did not give quite as good a vision as clear glass. At the time in question at least five of the windows were closed, three in front of the helmsman and two on the port side forward of the regular lookout station. The lookouts on each side of the bridge were placed, one on the starboard side to cover the arc from bow to stern, and one on the port side to cover the arc from bow to stern. On top of the bridge was the flying bridge of the same area as the bridge on the main deck, protected by canvas around the edge about waist high. There was no lookout on the bow, no lookout in the crow's nest, and no lookout on the flying bridge. A lookout was stationed on the starboard side of the v-shaped bridge, about 80 feet aft of the stem, whose duty it was to pay no attention to what was taking place on the other side of the bow. There was a lookout on the port side of the bridge whose jurisdiction also ended at the bow. These lookouts were on a bridge, crowded with instruments, occupied by four other men giving and taking orders, reporting signals, checking compasses, and doing other things tending to distract the attention of the lookouts. It is significant that the schooner was seen dead ahead where the arcs of the two lookouts ended. There is testimony that just before the vessels came together the port lookout of the Childs had left his station in order to enable the officer of the deck to work his pelorus out of that window; and that this lookout had moved forward 8 or 10 feet; that he and the signalman and the helmsman were all standing forward in the pilothouse within a few feet of each other; and that the port lookout was standing with his left arm on the voice tubes some distance inside the window. All these incidents emphasize the importance of the general rule that the bow is the proper place for a lookout. A vigilant lookout at the bow must have seen the spot light of the Coghlan on the sails of the schooner, for there is testimony that it diffused light over the schooner; that "it went the whole length of the ship"; that it "raked lengthwise of the ship from aft forward"; and that "it would interfere from plainly and distinctly seeing the green light." The reason offered by the man on the destroyer for not having a lookout on the bow is that, going at 18 knots, there is danger of spray coming over the bow. It appears by the proofs that the bow of the Childs was 12 feet high; that the wind had been southwest all the afternoon and evening, and off the land, "just a gentle wind." The sea was described by witnesses as "a light ground swell"; "very little sea." The destroyers are so constructed as to flare at the stem, and such construction has a tendency to throw the water from the bow. It appears also that the port lookout, Strong, off Haiti, when his ship was chasing torpedoes, had stood torpedo watch on the bow of the ship at night when the vessel was proceeding at 27 knots, and when there was more or less of a ground swell, and under circumstances which, according to his testimony, must have produced more spray than on the night of this collision. The port lookout testified that there was no water thrown over the deck on the night of the collision, and that a lookout could have been stationed on the bow of the Childs as she approached the schooner.

The book of naval instructions issued to the commanding officer of the Childs prescribes: "the commanding officer shall always when under way, and if necessary when at anchor, have a lookout stationed aloft during the day; at night he shall have as many lookouts stationed as are necessary." The proofs tend to show that a lookout could have been stationed in the crow's nest, 80 feet high. There is some testimony that at least a part of the time the Childs may have been blanketed by the Coghlan as the squadron

proceeded. Johnston, the young officer, says that this was possible, and Moran, the commander of the squadron, says so. The possibility of such blanketing seems evident. If in fact such blanketing took place, it is clear that a lookout stationed aloft would have been of great value. Commander Moran testified:

"Q. 222. Where, in your opinion, is the best place for a lookout at night? Up high, or down low? A. Why, I consider up high at night, because you can see farther. It extends the range of your visibility.

"Q. 223. Then if you had a lookout in your crow's nest he would have been in a better place to act as lookout than the lookout on your bridge? A. As far as lights are concerned. Yes.

"Q. 224. And he would have had a clear visibility all around, wouldn't he? A. Yes, sir.

"Q. 225. As a matter of fact, your port lookout hasn't got clear visibility very far beyond the bow on the starboard side, has he? A. He isn't supposed to. * * *

"Q. 239. And if he was in the crow's nest he would have been in a better position to see than the man on the bridge? You have already so testified? A. He could see farther. Yes, sir. Of course he would be covering a larger range up there.

"Q. 240. Well, that is the range that all commercial ship lookouts have, isn't it, Commander? A. I understand so."

There is also testimony that a lookout could have been stationed on the flying bridge directly above and 12 feet higher than the bridge. At this point the lookout would have been alone and would have had a clear view of the horizon where he was protected from the weather by a canvas rail, and where he had communication with the bridge by voice tubes. It may be noted after the collision the Bruce put lookouts on the flying bridge and in the crow's nest to look for survivors, and there is testimony that the crow's nest is where the lookouts stand at night in target practice.

No sufficient reasons have been shown for not placing a lookout at the bow. It is a position near the water, and at such a station a lookout could have been a more competent observer during the crucial time when the vessels were close together and when the signal was given from the Coghlan to the Childs and the spotlight was thrown upon the sails of the schooner.

The courts are insistent in requiring a lookout at the bow. In The Patria (D. C.) 92 F. 411, 414, Judge Addison Brown required a lookout to be stationed at the bow and also aloft. He made this ruling in a case where the lookout was stationed on the bridge, 75 feet aft from the bow. In Watts v. U. S. (D. C.) 123 F. 105, 113, a question arose of a collision between the United States cruiser Columbia and a British ship. Judge Adams said: "It was incumbent upon the Columbia to maintain lookouts as far forward and as near the water as possible and at a height above the water, as well for the purpose of hearing as seeing. The part of the bridge upon which the lookouts were stationed was 94 feet from the stem and 37 feet 6 inches above the water. The vessels were approaching each other at an angle of 12 to 15 degrees, and no excuse can be found for a failure to have lookouts forward, and there was no reason why they should not have been stationed at the stem, which besides being so much nearer any approaching object, was about 15 feet closer to the water. The necessity of having a lookout aloft also, under the circumstances, was obvious."

It may be noted that the error of relying upon lookout service from the bridge and not on the bow is a very common fault. It is almost as common as the prevailing error of passenger steamers in failing to observe the rules as to speed in a fog.

In the case before me it seems to me that a lookout should have been placed at or near the bow. I think, also, under all the circumstances of the case, the necessity appears for a lookout in the crow's nest. I have already referred to the instructions to the commanding officer that at night he shall have "as many lookouts stationed as are necessary." Under the circumstances of the case I think such a lookout was necessary, with the speed at which the squadron was proceeding and the possibility of the Childs being blanketed a portion of the time by the Coghlan. On all the proofs, I am constrained to find that the Childs was at fault in not maintaining a proper lookout.

I am confirmed in this finding by recent maritime cases. In Crowell v. U. S. (D. C.) 273 F. 227, 229, Judge Morton said: "The only excuse advanced by the steamer for her failure to keep out of the way of the schooner is that the latter was not showing a proper light; and there is no doubt a good deal of evidence on the part of the steamer that the light was dim and smoky. But I am inclined to give more credence to the schooner's crew than to the steamer's in regard to that matter. They had the steamer under

observation longer than the steamer seems to have had them, and would naturally in the meantime pay particular attention to their own lights. The Alice B. Phillips, 81 F. 415, 26 C. C. A. 467; The Richmond (D. C.) 114 F. 208, 211. They insist that their starboard light was burning brightly. The fact that the men on the schooner described correctly the changes of course made by the steamer shows that they were watching her, as they testified. The lookout on the steamer was a boy of 19, who, according to his deposition, had had a very limited experience at sea and as a lookout; the officers of the steamer, in addition to their duties, had been engaged in taking the bearing of the lighthouse; her mate, who testified that he was on the bridge, well may have had his attention more immediately devoted to other matters than to the sea ahead. Observations of the schooner's light made from the steamer as she slid past * * * by witnesses not disinterested, whose attention must have been distracted by the impending collision seems to me insufficient to outweigh the direct and positive testimony of the schooner's crew. On all the evidence I find that the schooner's lights were properly set and burning."

In Brigham v. Luckenbach, 140 F. 322, 325, this court said: "The tug was going out of Portland Harbor in the path of commerce, a place frequented by vessels of all kinds. She was under the duty, then, to have a lookout stationed at a point best suited for the purpose of hearing and seeing the approach of objects likely to be brought into collision. The United States Circuit Court of Appeals for the Fourth Circuit, in The Vedamore, 137 F. 844, holds that a lookout should be placed in the bow of the ship; that the bow is the best position from which to hear sounds and observe objects; and that it will not avail a ship, which is bound to properly place her lookout, to show that its deck was so overcrowded that proper room could not be reserved for stationing a lookout."

In The New York, 175 U. S. 187, 204, 20 S. Ct. 67, 73, 44 L. Ed. 126, supra, the court said: "Her officers failed conspicuously to see what they ought to have seen or to hear what they ought to have heard. This, unexplained, is conclusive evidence of a defective lookout."

In the English case, The Supply, L. T. R. vol. XII, there was testimony that the schooner had no lights visible, and Dr. Lushington said: "Notwithstanding the evidence for the defense, it is clear that the schooner had her proper lights fixed and burning; and therefore if due diligence had been used on board the Queen's ship the lights would have been seen. Again, it appears that the steamer, 'though manned by a crew of fifty-six men, had only one man forward on the lookout, and he was on the bridge, no one being stationed on the forecastle. The schooner was, I think, seen only at the last moment, and when the orders that were given to put the helm hard-a-starboard and stop and reverse the engines were too late to avert the collision."

In The Pilot Boy, 115 F. 873, 875, speaking for the Circuit Court of Appeals for the Fourth Circuit, Judge Simonton said: "It is the duty of every steamer navigating the thoroughfares of commerce to have a trustworthy lookout, besides the helmsman, and, in case of collision, the absence of such lookout is prima facie evidence that the collision was caused by the fault of the steamer. The Genesee Chief, 12 How. 443, 13 L. Ed. 1058. When acting as the officer of the deck, and having charge of the navigation, the master of a steamer is not a proper lookout. The Ottawa, 3 Wall. 269, 18 L. Ed. 165. Proper lookouts are persons other than officers of the deck or the helmsman, and they should be stationed on the forward part of the vessel." The Arthur M. Palmer [D. C.] 115 F. 417.

The government charges that the schooner Mills was in fault in not being properly lighted. The contention is made that the schooner displayed a white light forward of two points abaft the beam, and that this contributed to the collision.

I have already referred to the proofs offered by the government that, while the squadron was proceeding about six minutes before the collision, those on the Coghlan saw a dim white light dead ahead and that the officer of the deck kept the dim white light in sight until he saw the loom of the sails of the schooner, and that he recognized that the white light proceeded from what looked to him like a lantern on deck. There is further testimony from those on the Coghlan that the white light was a lantern "on or near the deck, aft, near the after deck house and on the starboard side"; that "it was not visible in all directions." Sedgewick says, "To the best of my recollection it was a lantern." The contention of the government is that this white light was a lantern on the deck of the schooner, and that it had the effect of advising the officers

on the deck of the destroyer that it was on a vessel going in the same direction; that, by reason of its dimness, the officers of the Coghlan were justified in the belief that it was the stern light of a vessel some distance off. I have already called attention to the testimony on the part of the Mills, that the white light proceeded from a flash-light thrown by Captain Chaney on the lee side of the spanker of the schooner to attract the attention of approaching vessels. The whole testimony adduced by the government is not clearly persuasive that the dim white light first seen from the Coghlan proceeded from a lantern. In any event, I think all the evidence offered by the government touching the white light is not sufficient to furnish an excuse for the great speed which the squadron kept up after seeing that the destroyers were approaching a vessel in the nighttime. It clearly was not an excuse for the later fault of the Childs in attempting to cross the bows of the schooner instead of passing to the left, as the Coghlan did.

The proofs on the part of the schooner show that, while proceeding off Currituck Light, a little after half past 8 in the evening, the navigator saw the yardarm blinker lights of several vessels which they thought to be United States naval vessels; that all on board were aroused by what seemed to be a danger; that about fifteen or twenty minutes before the collision, on the orders of Captain Chaney, the first mate Carver changed the 15-watt bulbs of the running lights to 25-watt bulbs, and that precautions were taken so that both the red and green lights were burning brightly.

The government offers some testimony that Carver is not corroborated in saying that he changed the bulbs, and that certain witnesses testify that they did not see him make such change. No direct testimony is adduced that the bulbs were not changed as Carver testified. Carver says further that at the captain's request he examined the lights and found them burning brightly; that he walked back and forth; that he watched the approach of the naval vessels, at all times seeing that the schooner's running lights were burning brightly.

All those on the schooner say that during the time the destroyers were approaching the running lights of the schooner were burning brightly.

It is noted too that the officers of the Childs took statements of all the survivors of the tragedy on the way to the shore, and at Norfolk they all testified before the local inspectors and were cross-examined by a board of officers, and their original statements were consistent that the running lights of the schooner were burning brightly up to the time of the collision, and after the collision until the schooner sank. There is testimony that the master himself went to the forecastle head twice, examined the lights, put the glasses on the destroyers' lights, cautioned his lookout to keep a sharp watch, flashed a pocket flash-light on the leeward side of the clean new spanker.

The government has offered much testimony on this subject. The navigating officer testified that ten minutes before the collision the white light was reported by the lookout on the port bow of the Coghlan; that bearings were taken; that, in sweeping the horizon through the glasses, he observed a dim white light between the steamer's lights; that dead ahead his attention was arrested by a dim white light. It seems this was about six minutes before the loom of the sails was seen. The government offers further testimony that no green light was seen; that the port lookout Coombs saw a white light, saw the form of the schooner, but did not see a green light. Zak, the signalman, testifies that he saw the sails about 50 feet off and no green light. Johnston, the young officer of the deck, testified that at no time did he see a green light. Majors, the starboard lookout, says that the first thing he saw was a very dim white light between one and two points on the port bow about a hundred yards off, and about the same time the dim outline of the forward part of the hull, and he saw no green light. Lieutenant Becker, the officer of the Bruce, says that when the schooner was halfway between the Coghlan and the Childs he first saw what appeared to him as a dim yellowish light.

It is urged by the government that the dim white light was observed only when the schooner was from 50 to 200 yards off, whereas the applicable rule requires a light to be of such a character as to be visible at a distance of two miles. It appears that Franklin, the second mate of the schooner, saw the green light of the schooner burning after he went aboard the Childs. Commander Hall says the schooner's green light showed plainly.

It is pointed out by the libelant that at the naval inquiry none of the government witnesses described the light as dim, and that the signal from the Coghlan to the Childs said nothing about the schooner being without a light, or that it was carrying

a dim light; and that the log of the destroyers made no mention of the light being "dim" or "out."

On examination of the log book it is found that no mention is made as to any inadequacy of the starboard light. The good appearance of the officers of the destroyers has been given merited praise. I cannot think that these highly trained men in command of the destroyers would have made so obvious an error as to omit a notation in the log that the green light was "dim" or "out" if such had been the fact.

In The Buenos Aires, 5 F.(2d) 425, 430, the Circuit Court of Appeals for the Second Circuit said: "The appellant's brief considers 'the question of whether or not the bark was displaying her green side light as decisive of this entire case.' This court concedes it to be decisive. But if it be decisive and no green light was displayed by the bark, as required by law, those in command of the steamer certainly would have had the absence of the light at the time of collision strongly impressed upon their mind, and the absence of the light would have been noted in the log of the steamer. But no such entry in the log was made at the time. And this notwithstanding the statutes of the United States provide: 'In every case of collision in which it is practicable so to do, the master shall, immediately after the occurrence, cause a statement thereof, and of the circumstances under which the same occurred, to be entered in the official log book.' Revised Statutes, § 4290 (Comp. St. § 8036 [46 USCA § 201]). It certainly is a matter of great significance that in a matter of such vital importance as the absence or failure to see the side lights of a sailing vessel, which was sent to the bottom by a collision with a steamer, the log of the steamer made no mention of the important and essential circumstance that the bark was displaying no lights at the time the collision occurred. It is hard to believe that so important an omission would have occurred had the lights not been burning."

In The Richmond (D. C.) 114 F. 208, 212, Judge Waddill said: "A most significant circumstance, bearing upon the vessel's lights, is the fact that, although the failure of the vessel in this regard is made the chief basis of the steamer's defense, the fact that such lights did not exist was not made record of at the time of the collision, either in the steamer's log or the protest made the next day. Both the log and the protest utterly fail to make any reference to such conditions, and it is hard to believe that so important an omission would have been made had the lights not been burning. Nothing could have been more material to the steamer,—nothing would so likely have accounted for the collision, and probably have vindicated the steamer. The Utopia (D. C.) 1 F. 892; The Frostburg (D. C.) 25 F. 451. The object of keeping the log was to have a record made at the time of the then existing facts. The Newfoundland (D. C.) 89 F. 510–515. Congress by act of the 14th of February, 1900, amending section 4290 of the Revised Statutes, has specifically required the facts of collision to be set forth in the log. This significant conduct on the part of the steamer, together with the other facts and circumstances in the case, convince me that the schooner's lights were properly set and burning at the time of the collision."

I have referred to Crowell v. U. S. (D. C.) 273 F. 227. In that case Judge Morton had before him evidence on the part of the steamer that the light on the schooner was dim and smoky; and Judge Morton said he gave more credence to the direct positive evidence of the schooner's crew who would have the steamer under observation for a long time.

In The Richmond (D. C.) 114 F. 208, 211, supra, Judge Waddill said: "This positive testimony by those on the schooner, in a position to see the lights, and know their condition, will not be lightly rejected because other persons, whose duty it was to have seen them, either failed to observe, or happened not to see them. Negative evidence of this character cannot be accepted to outweigh positive evidence. The failure to observe a light cannot be said to disprove its existence."

The government attacks the whole lighting outfit of the schooner. It urges that the system upon which the lights of the schooner depended for power was defective; that the wiring was such that, coming in contact with salt, grounding must result; that splicings which had been done in an improper and insufficient manner resulted in dimness of light; and that, as a result of the imperfect wiring, the green light, the only material light in question, was dim and insufficient. It presents testimony tending to show that defective conditions of the electric system aboard the schooner were known before the vessel sailed from Norfolk and were not remedied, and contends that this condition accounts for the dimness of the green light. It appears that the wiring of the red light exhibited in court was in poor condition.

The libelant contends that the condition of the red light is accounted for by the fact that it had been sunk to the bottom of the ocean and had come to the surface when the salt dissolved and the vessel was raised. It urges that, although the red light was produced in court, no attempt was made by the Coast Guard or navy to salvage the green light, the only light material in the case, although the schooner lay in but 25 feet of water near Lynnhaven off the coast of Virginia and naval divers were nearby at Norfolk. It may be said, too, that, if the green light had been salvaged and brought into court, the question would have been settled whether or not the bulbs were changed as alleged by the mate Carver.

The libelant further urges that nowhere in the case is there any testimony about the wiring of the green light.

Libelant has offered proofs also that prior to the vessel leaving the port of Norfolk for Turks Island on the last trip an entirely new set of batteries had been installed, new bulbs had been supplied, and the entire system had been overhauled and tested during a part of three days, and that no trouble had been experienced thereafter up to the time of the collision. The proofs shows that the schooner was equipped with a Delco system by which a generator operating by gasoline power creates electricity which fills sixteen storage batteries from which power was obtained to light seven circuits on the schooner, including the one of the starboard running light. In February, 1929, a set of sixteen new Delco light batteries was installed on the schooner.

I think the government is right in contending that an entirely new wiring system would have been better than the one used on the schooner; but I find no evidence that the starboard light was out of order.

I think I ought to give weight to the positive testimony of all the survivors on the schooner that the lights were burning brightly all the time the destroyer was approaching and at the time of the collision.

In Brigham v. Luckenbach, 140 F. 322, 328, supra, this court said: "The fact that the lookout on the schooner saw an approaching steamer, and at once looked to see if his own vessel's lights were in such condition that the steamer could see them, seems to me to be a circumstance in favor of the schooner. It seems to me to be the natural act of a careful man, and to make his testimony all the more valuable."

In Pennell v. U. S., 162 F. 64, 71, this court said: "The government's contention that there were no lights is based upon the testimony that when Admiral Casey came on board the brig he saw no lights, that when Bennett rowed around the brig he saw no lights, and that after the collision lanterns were found aboard with the lights out. Against this we have the distinct, affirmative testimony that the lights were properly lighted and set at 12 o'clock, and there is a presumption that such condition existed at the time of the collision; there being no testimony to the contrary. * * * The court must come to the conclusion that the testimony to which I have referred to as to the lights being out is not persuasive as against the affirmative testimony that there were lights."

In the case before me I must also give weight to the facts which I have found in regard to the insufficient lookout on the part of the Childs. In my opinion that was the prevailing cause of the tragedy.

I am constrained to find, from all the testimony, that the schooner Mills was not in fault in respect to maintaining proper lights.

The defense is made that, if the schooner had changed her course just before the collision, she would have avoided the tragedy. I think it is enough to say that at that time she clearly acted "in extremis," and should not be held at fault for anything she did under the circumstances. She was clearly brought into this condition by the fault of the Childs. The rule is that, where the duty lies upon the steamer to keep out of the way, the duty of the sailing vessel is to hold her course. In The Patria (D. C.) 92 F. 411, 414, supra, Judge Addison Brown, under peculiar circumstances, held that a schooner ought to have ported her helm; but he said: "No doubt there is great reluctance to find a sailing vessel in fault for keeping her course as respects a steamer that is bound to keep out of her way. This is the ordinary rule, and as was said by this court in Haight v. Bird, 26 F. 541, prior to the recent amendment of article 21: 'No exception to this rule can be allowed, except where it is entirely clear not only that by changing her course she would in fact have avoided the collision, but that under the circumstances of the moment, as they appeared to the sailing vessel, escape by that means was so easy and obvious to a person of ordinary nautical judgment, that it was clear negligence to omit it.' "

In the case before me the proofs do not make it clear that by changing her course or luffing she would have avoided the collision. I think it was her duty to hold her course and speed, as she did.

Two libels before me are brought under the Death on the High Seas Act, U. S. Code, title 46, chapter 21, § 761 et seq. (46 USCA § 761 et seq.), and the Public Vessels Act, U. S. Code, title 46, chapter 22, section 781 et seq. (46 USCA § 781 et seq.), the former permitting recovery in admiralty for a death on the high seas caused by negligence, and the latter permitting libels in personam against the United States for damages caused by a public vessel of the United States.

The libel No. 247 is brought by Eleanor M. Chaney as administratrix of the estate of her deceased father. The libel No. 266 is brought by Eliza Pogson as administratrix of the estate of her deceased husband, Paul Pogson. Chaney and Pogson, on April 4, 1929, were master and seaman, respectively, of the schooner Mills. No question is made but that their deaths took place as stated in the libels.

It is pointed out by the libelants that if entitled to recover they may do so by virtue of the statutes which I have quoted, of which the following excerpts are stated:

U. S. Code, title 46, chapter 21 (46 USCA c. 21) Death on the High Seas by Wrongful Act.

"Section 761: Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued. (Mar. 30, 1920, c. 111, § 1, 41 Stat. 537.)"

"Section 762: The recovery in such suit shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought and shall be apportioned among them by the court in proportion to the loss they may severally have suffered by reason of the death of the person by whose representative the suit is brought. (Mar. 30, 1920, c. 111, § 2, 41 Stat. 537.)"

"Section 766: In suits under this chapter the fact that the decedent has been guilty of contributory negligence shall not bar recovery, but the court shall take into consideration the degree of negligence attributable to the decedent and reduce the recovery accordingly. (Mar. 30, 1920, c. 111, § 6, 41 Stat. 537.)"

U. S. Code, title 46, chapter 22 (46 USCA, c. 22) Suits in Admiralty against United States for Damages Caused by or for Towage or Salvage Services.

"Section 781: A libel in personam in admiralty may be brought against the United States, or a petition impleading the United States, for damages caused by a public vessel of the United States, and for compensation for towage and salvage services, including contract salvage, rendered to a public vessel of the United States: Provided, That the cause of action arose after the 6th day of April, 1920. (Mar. 3, 1925, c. 428, § 1, 43 Stat. 1112.)"

The government in its answer has claimed that the words in the Public Vessels Act, "for damages caused by a public vessel of the United States," are not applicable where a person has suffered death by reason of a collision.

I think the libelants in these death cases are correct in saying that a broad construction should be placed upon this act, that it was obviously the purpose of the act to waive the sovereign's immunity with respect to accidents on the high seas caused by public vessels, and thereby relieve Congress of the multiplicity of special acts necessary to compensate persons who had suffered damages either to their person or property. The statute is remedial, and, under well-settled practice of statutory construction, should be liberally construed.

I do not understand that counsel for the government finds any fault with this broad construction given to the statute, but raises only the question that the loss of Pogson, Captain Chaney, and the cook was not the direct result of the negligence of the Childs, assuming such negligence to exist, but was rather the result of an intervening cause.

The government calls attention to the testimony in the case, and urges that the proofs show that: "The Master of the destroyer Childs kept her bow in the wound of the schooner until after he had made the second inquiry from Carver, the mate, as to whether all persons had been saved, to which

the mate both times replied that they had been. It was after the Childs backed from the schooner that the schooner sank, which was some minutes subsequent to the collision. Admittedly if the lifeboat had been kept in seaworthy condition so as to be properly launched, loss of lives would have been avoided. It is equally clear to us that when it was known that the lifeboat could not have been successfully launched, there was opportunity to go forward on the schooner and on to the destroyer without danger. This is emphasized by the fact that the mate previous to reporting to the master of the destroyer that all had been saved had gone aft, had cut the lashings of the lifeboat and knew that the lifeboat had been launched end down and could not be righted, then returned along the deck of the schooner and boarded the destroyer where he advised, in reply to the question put to him twice, that all had been saved. At that time he knew, or should have known, that the Captain was standing on deck and could not get into the lifeboat and that the two other men could not successfully find safety in the lifeboat because it was not kept swung out and in proper condition to be launched for safety of life at sea. He also knew that the master was a 300 pound man and physically unable to get into the boat, both on account of his weight and the fact that the boat was not within reach. Indeed, the circumstances properly may be read, under this situation, to have required the schooner to have kept lashed at an appropriate place a ladder to get into the lifeboat, for under normal conditions the size and weight of the captain required the use of the ladder for that purpose. Had the lifeboat been kept in a seaworthy condition so as to be promptly and properly launched, there could and would have been no difficulty in its launching." The captain of the destroyer testified as follows: "I called to my chief executive on the forecastle, and as this man came aboard I said, 'Are there any more men on the schooner?' There was a strange voice—I thought it was of the mate, but it may have been my executive officer—called back that the rest of the crew—about six men —were in the lifeboat, and I think 'I have cut the lifeboat clear.' I think it was the mate talking. I am not sure. At any rate I got that report. * * * I was assured by the mate of the schooner who came to the bridge with my executive officer, that his men were all saved and that the lifeboat was clear, * * * and on receiving this reply that all hands were safe I backed full speed and got out of the breach."

The learned proctor then cites certain testimony touching the subject, and quotes Wharton on Negligence, § 134, which states the rule as follows:

"Suppose that if it had not been for the intervention of a responsible third party the defendant's negligence would have produced no damage to the plaintiff, is the defendant liable to the plaintiff? This question must be answered in the negative for the general reason that causal connection between negligence and damage is broken by interposition of independent responsible human action.

"I am negligent on a particular subject matter as to which I am not contractually bound. Another person, moving independently, comes in and either negligently or maliciously so acts as to make my negligence injurious to a third person. If so, the person so intervening acts as a non-conductor and insulates my negligence so that I cannot be sued for the mischief which the person so intervening directly produces. He is the one who is liable to the person injured."

The learned proctor concludes: "Loss of life here occurred unnecessarily. Failure to have the lifeboat ready for prompt and safe launching and to provide ladder facilities which was necessary for use of the Master, coupled with the fact that ample opportunity was given for all hands to board the destroyer with the additional circumstances that the Master of the destroyer kept the bow of his vessel in the wound until he had been assured twice by the mate that all hands were safe, emphasizes that an intervening cause was responsible for loss of life. This ought to have been avoided."

The learned proctor for the libelants in these death cases contends that it may be urged that the captain and the two men of the crew who perished with him should have done what the other members of the crew did, namely, climb aboard the Childs; that doubtless they would have been better off if they had followed the example of the mate, but that, in time of peril such as that was, it is difficult to choose the proper course, and that it may be presumed that they desired to preserve their lives and did what they regarded as reasonable under the circumstances.

The learned proctor further contends that it is well recognized in the law that when a defendant, by his act, puts another person in danger of loss, and that person may thus be caused to act defensively, the result of this defensive act is a proximate result of the

defendant's act. In other words, that the intervening act under such circumstances does not break the chain of causation.

In the famous Squib Case, reported under the name of Scott v. Shepard, 2 W. Bl. 892, (1773), the defendant threw a lighted squib into a crowd. As it was about to hit one in the crowd, he threw it away from himself, and it exploded near the plaintiff and put his eye out. It was held that the defendant was the proximate cause of the plaintiff's injury. See Jones v. Boyce (1816) 1 Stark 493; Illinois Central R. R. v. Siler, 229 Ill. 390, 82 N. E. 362, 15 L. R. A. (N. S.) 819, 11 Ann. Cas. 368.

In The Edgar H. Vance (C. C. A.) 284 F. 56, the doctrine was carried further than in any of the above cases cited. In that case the defendant tug proceeded with its tow, although it was apparent that it was entering into a violent storm area. It was finally forced to cast the tow adrift to save itself. The captain of the tow during the two days during which the storm raged became exhausted by his efforts to keep his ship afloat. The weather moderated during the ensuing two days, and the tow attempted to make port. The exhausted captain failed to see a hidden shoal marked on his map with very small dots, and consequently wrecked his vessel upon it. The owner and underwriter of the tow sought damages from the tug for the loss. The lower court gave judgment for the libelants, finding that the tug was negligent in proceeding into the storm and that the failure of the captain to discover the shoal was due to his exhaustion. Held, decree affirmed. Certiorari denied Nehalem Steamship Co. v. Aktieselskabet Aggi, 230 U. S. 750, 43 S. Ct. 250, 67 L. Ed. 495. See, also, cases collected on this point in 36 Harvard Law Review, 228.

In the instant case, after examining the proofs, and the cases brought before me, I am constrained to hold in these death cases that those who unfortunately lost their lives in this tragedy by drowning, are shown by the testimony to have been placed in a position of peril by the fault of the destroyer Childs. They lost their lives in an attempt to get to a place of safety. I find that the loss of their lives was nevertheless a proximate result of the fault of the defendant.

After a careful consideration of the proofs in all these cases, the court finds that the defendant's destroyer, the Childs, was solely at fault. A decree may be drawn for the libelants. John W. Lowrance, Esq., of Boston, Mass., is appointed assessor.